# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRIAN H. ROBB, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EDUCATION MANAGEMENT CORPORATION, EDWARD H. WEST, RANDALL J. KILLEEN, and MICK J. BEEKHUIZEN,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br><br><br>**Electronically Filed** |

## CLASS ACTION COMPLAINT

Plaintiff Brian H. Robb ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Education Management Corporation, ("EDMC" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired EDMC securities between August 8, 2012 and September 16, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Education Management Corporation is a publicly traded, for-profit education company. The company offers academic programs to students through campus-based and online instruction to earn undergraduate and graduate degrees, including doctoral degrees, and specialized non-degree diplomas in a range of disciplines.

3.      The company operates 110 locations across 32 states of the United States and Canada. Education Management Corporation was founded in 1962, is headquartered in Pittsburgh, Pennsylvania, and its shares trades on the NASDAQ under the ticker symbol "EDMC".

4.      Throughout the Class Period, defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (1) EDMC was overstating revenue by not properly increasing its bad debt reserve upon student withdrawals; (2) EDMC was overstating goodwill; (3) EDMC manipulated federal student loan and grant programs in order to appear to be in compliance with new federal regulations enacted in June 2011; (4) EDMC's predatory and deceptive recruiting and enrollment practices violated

federal regulations enacted beginning in June 2011 and (5) as a result of the foregoing, EDMC's public statements were materially false and misleading at all relevant times.

5.      EDMC touts itself as providing valuable educational opportunities to those who may be unable to attend traditional colleges and universities – such as working adults, and those seeking to take on-line courses – and as filling the education gap left by non-profit private and public institutions of higher learning. Particularly, as many Americans have fallen on difficult economic times in recent years, business has been booming for these for-profit institutions as students have sought out new educational opportunities in hopes of improving their earning potential and embarking on new career paths. In 2008, nearly two million students were enrolled in for-profit institutions.  Not only have these companies attracted substantial numbers of students, they have been able to raise significant capital from investors by publicly portraying their business models as successful, growing, and sustainable.

6.      The Company derives over 80% of its revenues from federal education funds, such as the Pell grant and Stafford loan programs, which assist students in paying for higher education programs.

7.      Because many students drop out of EDMC's student programs, enrollment growth is critical to the success of the Company. In order to meet revenue and profit expectations, EDMC recruits as many students as possible to enroll in its programs.

8.      In August 2008, the Company introduced the Education Finance Loan program, as the financial crisis was peaking and after private lenders stopped making loans to EDMC students.

9.      The Education Finance Loan program enabled students who had exhausted all available government-sponsored or other aid and had been denied a private loan, to borrow a

portion of their tuition and other educational expenses at EDMC schools if they or a co-borrower met certain eligibility and underwriting criteria. The extension of credit to its students was for periods of up to 36 months, a practice which would result in higher bad debt expense as a percentage of net revenues.

10.     The Education Finance Loan program helps keep EDMC from running afoul of the so-called "90/10 Rule," a government regulation enacted in October 1999, that requires for profit colleges such as EDMC, to ensure that at least 10% of their revenues comes from non-state financial aid sources, such as Pell Grants or Stafford loans.

11.     8.     Furthermore, under federal regulations, if an institution's three-year cohort default rate equals or exceeds 30% for any given year, it must establish a default prevention task force and develop a default prevention plan with measurable objectives for improving the default rate.

12.     On August 3, 2010, the United States Government Accountability Office ("GAO") issued a report ("GAO Report") in connection with a hearing held by the Health, Education, Labor and Pensions Committee (the "HELP Committee") concluding that for-profit educational colleges such as EDMC had engaged in an illegal and fraudulent course of action designed to recruit students and overcharge the federal government for the cost of their education. Thereafter, the HELP Committee launched an investigation of such practices; the U.S. Department of Education released data showing that the loan repayment rates for enrollees at thirteen campuses operated by EDMC were below the proposed threshold of 35 percent required for federal loan program eligibility; and the Company disclosed that its enrollee default rates had significantly increased.

13.    In addition to issues with the Company's lending practices, the GAO Report, which was originally issued in August 2010, and revised in November 2010, also disclosed an undercover investigation conducted by the GAO. The Chicago campus of Argosy University was included in the undercover investigation. The GAO investigation found that the Company's admissions representatives made "deceptive or otherwise questionable statements" to the GAO investigators.

14.    Over the course of the following two years, and in response to the GAO report and Congressional investigation, several state authorities began investigating the Company, including the Attorney General's Office for the states of Colorado, New York, Florida, Kentucky, Massachusetts, and the City Attorney of the City of San Francisco.

15.    In response to reports of similar misconduct by other for-profit education companies, in June 2011, President Obama released final regulations requiring for profit colleges such as EDMC to better prepare students for gainful employment or risk losing access to Federal student aid. Under the new gainful employment regulations:

> [A] program would be considered to lead to gainful employment if it meets at least one of the following three metrics: at least 35 percent of former students are repaying their loans (defined as reducing the loan balance by at least $1); the estimated annual loan payment of a typical graduate does not exceed 30 percent of his or her discretionary income; or the estimated annual loan payment of a typical graduate does not exceed 12 percent of his or her total earnings.

16.    Throughout the Class Period, the Company continually touted its compliance with these new regulations.

17.    Despite these representations, the compliance efforts of the Company, including the Education Finance Loan program, served only to perpetuate the inherent issues with the Company's high student default rates and low graduation and gainful employment statistics.

18.     On July 30, 2012, Senator Tom Harkin, chairman of the Health, Education, Labor and Pensions Committee (the "HELP Committee") completed a two-year investigation of the for-profit college industry, and issued a report (the, "Harkin Report") filled with troubling statistics and findings regarding the for profit college industry, and specifically about EDMC.

19.     After the Harkin Report was published, the Company's shares fell almost 8% or $0.32, to close at $3.77 on July 30, 2012.

20.     According to the Harkin Report, the Company's aggressive lending and recruiting practices resulted in a student body that is underprepared for college, generally unable to obtain gainful employment, and laden with a significant amount of debt. Indeed, the cost of many of the Company's programs, particularly those offered by the Art Institutes, is fairly substantial, and students completing these programs often struggle to find jobs. More critically, when the student outcomes for the company as a whole are examined, the company has some of the highest numbers of students leaving the company's programs without completing a certificate or degree of any company examined. The report stated:

> Information EDMC provided to the committee indicates that of the 78,661 students who enrolled at EDMC-owned colleges in 2008-9, 62.1 percent, or 48,840 students, withdrew as of mid-10. This is the fourth highest withdrawal rate of any company examined by the committee. These students were enrolled a median of 4 months. Further, a considerably higher percentage of students withdrew from EDMC compared to the overall withdrawal rate of 54 percent.

> EDMC's Certificate program has the highest withdrawal rate of all Certificate programs examined and is substantially higher than the sector-wide rate of 38.5 percent. EDMC's Associate and Bachelor's programs also rank amongst the ten highest withdrawal rates for both categories. Additionally, EDMC's Bachelor degree withdrawal rate is significantly higher than the sector-wide rate of 54.3 percent.

*     *     *

> The default rate across all 30 companies examined increased each fiscal year between 2005 and 2008, from 17.1 percent to 23 percent. This change represents a 32.6 percent increase over 4 years. EDMC's default rate has similarly increased,

6

growing from 11.7 percent for students entering repayment in 2005 to 16 percent for students entering repayment in 2008.

The default picture at some individual campuses is particularly dire. At EDMC's Brown Mackie College Arizona campuses 33.3 percent of its students entering repayment in 2008 defaulted within 3 years. Additional poor performing campuses include Brown Mackie Colleges in Cincinnati, OH (24.9 percent default rate) and Findlay, OH (23.1 percent default rate).

21.     Also, according to the Harkin Report, in response to the rising default rate of its student borrowers, the Company began a series of "default management" programs in an attempt to prevent revocation of EDMC's Federal financial aid eligibility. The default management program however did not actually solve the issue of loan defaults, but instead placed student loans on deferment and forbearance, to allow the Company to account for these loans as performing and not in default, thus maintaining the appearance of compliance with federal regulations. The report stated:

> It is likely that the reported default rates significantly undercount the number of students who ultimately face default, because of companies' efforts to place students in deferments and forbearances. Helping get delinquent students into repayment, deferment, or forbearance prior to default is encouraged by the Department of Education. However, for many students forbearance and deferment serve only to delay default beyond the 3-year measurement period the Department of Education uses to track defaults.

> Default management is sometimes accomplished by putting students who have not made payments on their student loans into temporary deferments or forbearances. While the use of deferment and forbearance is fairly widespread throughout the sector, documents produced indicate that a number of companies also pursue default management strategies that include loan counseling, education, and alternative repayment options. Default management contractors are paid to counsel students into.

> EMDC, like many other for-profit colleges, contracted with the General Revenue Corporation (GRC), a subsidiary of Sallie Mae, to "cure" students who are approaching default. In practice, documents indicate that at many companies, nearly all "cures" are accomplished by deferment or forbearance, not by students actually repaying their loans.

> Internal documents suggest that EDMC is taking aggressive action to manage their default rate. "Get comfortable with doing a verbal forbearance!!!," instructs

EDMC's Spring 2010 Default Prevention presentation. The same presentation adds, "DON'T B AFRAID-KEEP CALLING and KEEP CALLING LET THEM KNOW THIS IS NOT GOING TO GO AWAY" and that "It's time to be aggressive since we are now in a 3 year CDR window - defaults are likely to double/triple!! Take action now!!"

\*\*\*

Moreover, forbearances may not always be in the best interest of the student. This is because during forbearance of Federal loans, as well as during deferment of unsubsidized loans, interest still accrues. The additional interest accrued during the period of forbearance is added to the principal loan balance at the end of the forbearance, with the result that interest then accrues on an even larger balance. Thus, some students will end up paying much more over the life of their loan after a forbearance or deferment.

22.     The Harkin Report criticizes the deferment and forbearance programs as especially detrimental to the long term prospects of students, as these programs usually have negative long term financial consequences for the student-borrower, who will incur larger long term borrowing costs, while the Company can report lower student default rate and offer a rosier picture to investors and federal regulators. The report concluded:

Evidence suggests that some for-profit colleges use forbearance and deferment as tools to move the school's default rate, without concern for a students' particular situation or whether it is in the best financial interest of the individual. Many students will end up paying more over the life of their loan after a forbearance or deferment.

23.     On March 22, 2013 the Company filed a Form 8-K with the SEC, announcing that it received a subpoena from the Division of Enforcement of the Securities and Exchange Commission. The Form 8-K stated, in part:

On March 19, 2013, Education Management Corporation (the "Company") received a subpoena from the Division of Enforcement of the Securities and Exchange Commission ("SEC") requesting documents and information relating to the Company's valuation of goodwill and to its bad debt allowance for student receivables. The Company intends to cooperate with the SEC in its investigation.

24.     On May 17, 2013 the Company filed a Form 8-K with the SEC, announcing that it received another subpoena from the Division of Enforcement of the Securities and Exchange Commission. The Form 8-K stated, in part:

> On May 13, 2013, Education Management Corporation (the "Company") received a subpoena from the Division of Enforcement of the Securities and Exchange Commission (the "SEC") requesting documents and information relating to the letters of credit the Company posted with the U.S. Department of Education and the Company's compliance with the U.S. Department of Education's standards of financial responsibility for participation in Title IV programs. The Company intends to cooperate with the SEC in its investigation.

25.     On June 20, 2013, after the close of trading, the Company issued a press release and filed a Form 8-K with the SEC, announcing the termination of John M. Mazzoni, the President of The Art Institutes. In the Form 8-K, the Company stated, in part:

> On June 14, 2013, Education Management LLC (the "Company") and John M. Mazzoni, the President of The Art Institutes, agreed to terminate Mr. Mazzoni's employment with the Company effective July 14, 2013 (the "Departure Date"). In consideration of Mr. Mazzoni's (i) agreement to remain in the employment of the Company until the Departure Date and provide consulting services to the Company until December 31, 2013 and (ii) execution of a general release in favor of the Company and its affiliates and related parties pursuant to a Waiver and Release of Claims, the Company has agreed to pay Mr. Mazzoni the amounts he is entitled to receive upon a termination other than for Cause as defined in the employment agreement, dated December 7, 2006, between the Company and Mr. Mazzoni (the "Employment Agreement") and a fiscal 2013 Management Incentive Compensation Plan ("MICP") bonus at 100% of his target bonus, in addition to any amount that Mr. Mazzoni would have received under the fiscal 2013 MICP if executive officers of the Company receive payments for fiscal 2013 under the MICP.

26.     On this news, the Company's shares fell over 10% or $0.71, to close at $6.22 on June 21, 2013. On the next trading day, the Company's shares fell over 12% or $0.75, to close at $5.47 on June 24, 2013. The total drop over two trading days was over 21% or $1.46.

27.     On June 27, 2013, the Company filed a Form 8-K with the SEC, announcing the resignation of its Vice President, Controller and Chief Accounting Officer, Randall J. Killeen. The Form 8-K stated, in part:

On June 24, 2013, Randall J. Killeen provided notice of resignation as Vice President, Controller and Chief Accounting Officer of Education Management Corporation (the "Company"). Mr. Killeen has agreed to continue to serve in his current position until the conclusion of the meeting of the Audit Committee of the Company's Board of Directors to consider the Company's financial results for fiscal 2013.

28.    On November 1, 2013, after the close of trading, the Company filed a Form 8-K

with the SEC, announcing the termination of its Chairman, Todd S. Nelson. The Form 8-K

stated, in part:

On October 28, 2013, Education Management LLC (the "Company") and Todd S. Nelson, Chairman of the Board of Directors of the Company, agreed to terminate Mr. Nelson's employment effective November 8, 2013 (the "Departure Date").

29.    On this news, the Company's shares fell almost 5.5% or $0.80, to close at $13.78

on November 4, 2013.

30.    On January 24, 2014, the Company filed a Form 8-K with the SEC, announcing

that it received inquiries from twelve states regarding the Company's business practices. The

Form 8-K stated, in part:

Education Management Corporation (the "Company") announced today that it has received inquiries from twelve states regarding the Company's business practices. The Attorney General of the Commonwealth of Pennsylvania has informed the Company that it will serve as the point of contact for the inquiries related to the Company. The inquiries focus on the Company's practices relating to the recruitment of students, graduate placement statistics, graduate certification and licensing results, and student lending activities, among other matters. The Company believes that several other companies in the for-profit education industry have received similar inquiries. The Company intends to cooperate with the states involved.

31.    On this news, the Company's shares fell over 10% or $0.97, to close at $8.70 on

January 27, 2013.

32.     On September 16, 2014, after the close of trading, the Company filed a Form 12b-25 with the SEC, notifying the SEC that it would delay the filing of its Annual Report on Form 10-K for the period ended June 30, 2014. As to the cause of the delay and the potential restatement, the Company stated the following:

> We are unable to timely file our Report on Form 10-K for the fiscal year ended June 30, 2014 without unreasonable effort or expense due to unresolved comments from the Division of Corporation Finance of the Securities and Exchange Commission (the "SEC") related to our revenue recognition and related bad debt reserve recorded upon student withdrawals from school. We intend to file our June 30, 2014 Form 10-K upon resolution of these remaining comments raised by SEC.

33.     As a result of this news, shares of EDMC fell $0.12 or almost 10%, to close at $1.10 on September 17, 2014.

34.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

35.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

36.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

37.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

38.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

### PARTIES

39.     Plaintiff, as set forth in the attached Certification, acquired EDMC securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

40.     Defendant EDMC is a Pennsylvania corporation with its principal executive offices located at 210 Sixth Avenue 33rd Floor Pittsburgh, PA 15222.  EDMC's common stock trades on the NASDAQ under the ticker symbol "EDMC."

41.     Defendant Edward H. West ("West") has served at all relevant times as the Company's President, Director, and Chief Executive Officer ("CEO").

42.     Defendant Randall J. Killeen ("Killeen") has served at all relevant times until his termination April 10, 2013 as the Company's Acting Chief Financial Officer. Also, at all relevant times until in or around October  2013, Killeen served as the Company's Vice President, Controller, and Chief Accounting Officer.

43.     Defendant Mick J. Beekhuizen ("Beekhuizen") has served at all relevant times starting from April 10, 2013, as the Company's Executive Vice President and Chief Financial Officer.

44.     The defendants referenced above in ¶¶ 41 - 43 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

45.     Education Management Corporation is a publicly traded, for-profit education company. The company offers academic programs to students through campus-based and online instruction to earn undergraduate and graduate degrees, including doctoral degrees, and specialized non-degree diplomas in a range of disciplines.

46.     The company operates 110 locations across 32 states of the United States and Canada. Education Management Corporation was founded in 1962, is headquartered in Pittsburgh, Pennsylvania, and its shares trades on the NASDAQ under the ticker symbol "EDMC".

### Materially False and Misleading
### Statements Issued During the Period

47.     On August 8, 2012, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the fourth fiscal quarter and full fiscal year ended June 30, 2012. For the fourth quarter, the Company recorded net revenues of $639.2 million, compared to $695.4 million for the prior year quarter and a  net loss of $1.19 billion, or a $9.51 loss per diluted share, compared to net income of $34.8 million, or $0.26 per diluted share, for the same period a year ago. For the full year, the Company reported net revenues of $2.76 billion, compared to $2.89 billion in fiscal 2011 and a net loss of $1.52 billion, or a $11.97 loss per diluted share, compared to net income of $229.5 million, or $1.66 per diluted share, for the prior fiscal year.

48.     On September 12, 2012, the Company filed a Form 10-K with the SEC which was signed by Defendants West and Killeen, and reiterated the Company's previously announced quarterly and fiscal year-end financial results and financial position. In addition, the 10-K

contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants West and Killeen, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49.    On October 31, 2012, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the first fiscal quarter ending September 30, 2012. The Company reported net revenues of $609.6 million, compared to $682.1 million recorded in the first quarter of fiscal 2012 and a net loss of $13.1 million, or a $0.11 loss per diluted share, compared to net income of $27.0 million, or $0.21 per diluted share, for the same period the prior year.

50.    On November 8, 2012, the Company filed a Form 10-Q with the SEC which was signed by Defendant Killeen, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants West and Killeen, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. In the 10-Q, the Company stated, in part:

### State Attorney General Investigations

In September 2012, the Company received a subpoena from the State of Colorado Attorney General's office requesting documents and detailed information for the period of January 1, 2006 through the present. The subpoena is primarily focused on the programs offered by the College of Psychology and Behavioral Sciences at the Denver, Colorado campus of Argosy University. Argosy University also received in September 2012 demand letters from an attorney representing three former students in the Doctorate of Counseling Psychology program alleging that the students were unable to find internships necessary to complete the program in Denver, Colorado and that the campus claimed that the program would lead to licensure in Colorado, among other things. The Company intends to cooperate

with the Attorney General's investigation. However, the Company cannot predict the eventual scope, duration or outcome of the investigation at this time.

51.     On January 30, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the second fiscal quarter ending December 31, 2012. The Company reported net revenues of $654.9 million, compared to $737.2 million recorded in the second quarter of fiscal 2012, and net income of $31.1 million, or $0.25 per diluted share, compared to $63.1 million, or $0.49 per diluted share, the same period in the prior year.

52.     On February 8, 2013 the Company filed a Form 10-Q with the SEC which was signed by Defendant Killeen, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants West and Killeen, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. In the 10-Q, the Company stated, in part:

*State Attorney General Investigations*

In January 2013, The New England Institute of Art received a civil investigative demand from the Commonwealth of Massachusetts Attorney General requesting information for the period from January 1, 2010 to the present pursuant to an investigation of practices by the school in connection with marketing and advertising job placement and student outcomes, the recruitment of students and the financing of education. The Company previously responded to a similar request that The New England Institute of Art received in June 2007 and intend to cooperate with the Attorney General in connection with their investigations.

53.     On March 22, 2013 the Company filed a Form 8-K with the SEC, announcing that it received a subpoena from the Division of Enforcement of the Securities and Exchange Commission. The Form 8-K stated, in part:

On March 19, 2013, Education Management Corporation (the "Company") received a subpoena from the Division of Enforcement of the Securities and Exchange Commission ("SEC") requesting documents and information relating to the Company's valuation of goodwill and to its bad debt allowance for student receivables. The Company intends to cooperate with the SEC in its investigation.

54.    On April 10, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing the appointment of Mick J. Beekhuizen, as Executive Vice President and Chief Financial Officer. With the appointment of Beekhuizen as CFO, Killeen ended his term as the acting Chief Financial Officer but retained his position as the Company's Vice President, Controller and Chief Accounting Officer.

55.    On May 1, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the third fiscal quarter ending March 31, 2013. The Company reported net revenues of $638.9 million, compared to $702.5 million recorded in the third quarter of fiscal 2012, and a net loss of $284.0 million, or $2.28 per diluted share, compared to a net loss of $417.1 million, or $3.31 per diluted share, for the same period a year ago.

56.    On May 10, 2013, the Company filed a Form 10-Q with the SEC which was signed by Defendant Beekhuizen, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants West and Beekhuizen, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

57.    On May 17, 2013 the Company filed a Form 8-K with the SEC, announcing that it received another subpoena from the Division of Enforcement of the Securities and Exchange Commission. The Form 8-K stated, in part:

On May 13, 2013, Education Management Corporation (the "Company") received a subpoena from the Division of Enforcement of the Securities and Exchange Commission (the "SEC") requesting documents and information relating to the letters of credit the Company posted with the U.S. Department of Education and the Company's compliance with the U.S. Department of Education's standards of financial responsibility for participation in Title IV programs. The Company intends to cooperate with the SEC in its investigation.

58.     On June 20, 2013, after the close of trading, the Company issued a press release

and filed a Form 8-K with the SEC, announcing the termination of John M. Mazzoni, the

President of The Art Institutes. In the Form 8-K, the Company stated, in part:

On June 14, 2013, Education Management LLC (the "Company") and John M. Mazzoni, the President of The Art Institutes, agreed to terminate Mr. Mazzoni's employment with the Company effective July 14, 2013 (the "Departure Date"). In consideration of Mr. Mazzoni's (i) agreement to remain in the employment of the Company until the Departure Date and provide consulting services to the Company until December 31, 2013 and (ii) execution of a general release in favor of the Company and its affiliates and related parties pursuant to a Waiver and Release of Claims, the Company has agreed to pay Mr. Mazzoni the amounts he is entitled to receive upon a termination other than for Cause as defined in the employment agreement, dated December 7, 2006, between the Company and Mr. Mazzoni (the "Employment Agreement") and a fiscal 2013 Management Incentive Compensation Plan ("MICP") bonus at 100% of his target bonus, in addition to any amount that Mr. Mazzoni would have received under the fiscal 2013 MICP if executive officers of the Company receive payments for fiscal 2013 under the MICP.

59.     On this news, the Company's shares fell over 10% or $0.71, to close at $6.22 on

June 21, 2013. On the next trading day, the Company's shares fell over 12% or $0.75, to close at

$5.47 on June 24, 2013. The total drop over two trading days was over 21% or $1.46.

60.     On June 27, 2013, the Company filed a Form 8-K with the SEC, announcing the

resignation of its Vice President, Controller and Chief Accounting Officer, Randall J. Killeen.

The Form 8-K stated, in part:

On June 24, 2013, Randall J. Killeen provided notice of resignation as Vice President, Controller and Chief Accounting Officer of Education Management Corporation (the "Company"). Mr. Killeen has agreed to continue to serve in his current position until the conclusion of the meeting of the Audit Committee of the

Company's Board of Directors to consider the Company's financial results for fiscal 2013.

61.    On August 7, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the fourth fiscal quarter and full fiscal year ending June 30, 2013. For the quarter, the Company reported net revenues of $595.2 million, compared to $639.2 million recorded in the fourth quarter of fiscal 2012, and a net loss of $2.0 million, or $0.02 per diluted share, compared to a net loss of $1,188.7 million, or $9.51 per diluted share, for the same period a year ago.  For the year, the Company reported net revenues of $2,498.6 million, compared to $2,761.0 million recorded in the fiscal year ended June 30, 2013, and a net loss of $268.0 million, or $(2.15) per diluted share, compared to a net loss of $1,515.7 million, or $(11.97) per diluted share, for the prior fiscal year.

62.    On September 3, 2013, the Company filed a Form 10-K with the SEC which was signed by Defendants West and Beekhuizen, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants West and Beekhuizen, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. In the 10-Q, the Company stated, in part:

**ITEM 1B.        UNRESOLVED STAFF COMMENTS**

On June 22, 2012, t he Company received a letter from the Staff of the Securities and Exchange Commission (the "SEC") Division of Corporation Finance regarding the Company's Form 10-K for the fiscal year ended June 30, 2011 (filed August 30, 2011) and the Form 10-Q for the fiscal quarter ended March 31, 2012. We engaged in communications and correspondence with the Staff responding to that letter and to additional letters received from the Staff with further comments with respect to these filings and subsequent filings. Our last response to the Staff was dated January 24, 2013. We believe the responses to the comment letters that we have provided and the additional disclosures we have incorporated into our subsequent periodic filings are responsive to the SEC's comments. However, as of

the date of this annual report, the Company has not received notice from the Staff that its review process is complete. Some of the comments involved our accounting for and timing of goodwill impairment and bad debt expense for student receivables.

On March 20, 2013, and May 13 2013, the Company received subpoenas from the Division of Enforcement of the SEC requesting documents and information relating to the Company's valuation of goodwill and its bad debt allowance for student receivables and letters of credit posted with the U. S. Department of Education, respectively. Refer to Item 3, "Legal Proceedings" for additional information regarding the SEC investigation.

**OIG Subpoena**

On May 24, 2013, the Company received a subpoena from the Office of Inspector General of the U.S. Department of Education requesting policies and procedures related to Argosy University's attendance, withdrawal and return to Title IV policies during the period of July 1, 2010 through December 31, 2011 and detailed information on a number of students who enrolled in Argosy University's Bachelor's of Psychology degree program. The Company plans to cooperate with the Office of Inspector General in connection with its investigation. However, the Company cannot predict the eventual scope, duration or outcome of the investigation at this time.

63.    On October 30, 2013, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the first fiscal quarter ending September 30, 2013. The Company reported net revenues of $580.4 million, a decrease of 4.8 percent from the prior year quarter, and the Company reported a net loss of $9.5 million, or $0.08 per diluted share, as compared to a net loss of $13.1 million, or $0.11 per diluted share, in the prior year quarter.

64.    On November 1, 2013, after the close of trading, the Company filed a Form 8-K with the SEC, announcing the termination of its Chairman, Todd S. Nelson. The Form 8-K stated, in part:

On October 28, 2013, Education Management LLC (the "Company") and Todd S. Nelson, Chairman of the Board of Directors of the Company, agreed to terminate Mr. Nelson's employment effective November 8, 2013 (the "Departure Date").

65.    On this news, the Company's shares fell almost 5.5% or $0.80, to close at $13.78 on November 4, 2013.

66.    On November 1, 2013, the Company filed a Form 10-Q with the SEC which was signed by Defendant Beekhuizen, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants West and Beekhuizen, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

67.    On January 24, 2014, the Company filed a Form 8-K with the SEC, announcing that it received inquiries from twelve states regarding the Company's business practices. The Form 8-K stated, in part:

> Education Management Corporation (the "Company") announced today that it has received inquiries from twelve states regarding the Company's business practices. The Attorney General of the Commonwealth of Pennsylvania has informed the Company that it will serve as the point of contact for the inquiries related to the Company. The inquiries focus on the Company's practices relating to the recruitment of students, graduate placement statistics, graduate certification and licensing results, and student lending activities, among other matters. The Company believes that several other companies in the for-profit education industry have received similar inquiries. The Company intends to cooperate with the states involved.

68.    On this news, the Company's shares fell over 10% or $0.97, to close at $8.70 on January 27, 2013.

69.    On February 5, 2014, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the second fiscal quarter ending December 31, 2013. The Company reported net revenues of $593.7 million, a decrease of 9.3 percent from the prior year quarter, and the company reported net income of $1.1 million, or

$0.01 per diluted share, as compared to net income of $31.1 million, or $0.25 per diluted share, in the prior year quarter.

70.     On February 10, 2014 the Company filed a Form 10-Q with the SEC which was signed by Defendant Beekhuizen, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants West and Beekhuizen, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

71.     On April 30, 2014, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the third fiscal quarter ending March 31, 2014. The Company reported net revenues of $595.2 million, a decrease of 6.8 percent from the prior year quarter, and a net loss of $467.6 million, or $3.71 per diluted share.

72.     On May 8, 2014 the Company filed a Form 10-Q with the SEC which was signed by Defendant Beekhuizen, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants West and Beekhuizen, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

73.     On September 16, 2014, after the close of trading, the Company filed a Form 12b-25 with the SEC, notifying the SEC that it would delay the filing of its Annual Report on Form 10-K for the period ended June 30, 2014. As to the cause of the delay and the potential restatement, the Company stated the following:

> We are unable to timely file our Report on Form 10-K for the fiscal year ended June 30, 2014 without unreasonable effort or expense due to unresolved

21

comments from the Division of Corporation Finance of the Securities and Exchange Commission (the "SEC") related to our revenue recognition and related bad debt reserve recorded upon student withdrawals from school. We intend to file our June 30, 2014 Form 10-K upon resolution of these remaining comments raised by SEC.

74.     As a result of this news, shares of EDMC fell $0.12 or almost 10%, to close at $1.10 on September 17, 2014.

75.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

76.     The statements referenced in ¶¶ 47-51, 55-56, 61-63, 66, 69-72 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (1) EDMC was overstating revenue by not properly increasing bad debt reserve upon student withdrawals; (2) EDMC was overstating goodwill; (3) EDMC manipulated federal student loan and grant programs in order to appear to be in compliance with new federal regulations enacted in June 2011; (4) EDMC's predatory and deceptive recruiting and enrollment practices violated federal regulations enacted beginning in June 2011 and (5) as a result of the foregoing, EDMC's public statements were materially false and misleading at all relevant times.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired EDMC securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

78.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, EDMC securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by EDMC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

80.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

81.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of EDMC;

- whether the Individual Defendants caused EDMC to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of EDMC securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

82. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

83. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- EDMC securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold EDMC securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

84.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

85.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

86.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

88.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of EDMC securities; and (iii) cause Plaintiff and other members of the Class to purchase or

otherwise acquire EDMC securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

89.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for EDMC securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about EDMC's finances and business prospects.

90.     By virtue of their positions at EDMC, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

91.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of EDMC securities from their personal portfolios.

92.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of EDMC, the Individual Defendants had knowledge of the details of EDMC's internal affairs.

93.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of EDMC.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to EDMC's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of EDMC securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning EDMC's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired EDMC securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

94.     During the Class Period, EDMC securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of EDMC securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise

acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of EDMC securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of EDMC securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

95.      By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

96.      As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

97.      Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

98.      During the Class Period, the Individual Defendants participated in the operation and management of EDMC, and conducted and participated, directly and indirectly, in the conduct of EDMC's business affairs.  Because of their senior positions, they knew the adverse non-public information about EDMC's misstatement of income and expenses and false financial statements.

99.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to EDMC's financial condition and results of operations, and to correct promptly any public statements issued by EDMC which had become materially false or misleading.

100.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which EDMC disseminated in the marketplace during the Class Period concerning EDMC's results of operations.    Throughout the Class Period, the Individual Defendants exercised their power and authority to cause EDMC to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of EDMC within the meaning of Section 20(a) of the Exchange Act.    In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of EDMC securities.

101.    Each of the Individual Defendants, therefore, acted as a controlling person of EDMC.  By reason of their senior management positions and/or being directors of EDMC, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, EDMC to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of EDMC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

102.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by EDMC.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 19, 2014

Respectfully submitted,

**LAW OFFICE OF ALFRED
  G. YATES, JR., P.C.**

s/ Alfred G. Yates, Jr.
Alfred G. Yates. Jr., Esq. (PA17419)
Gerald L. Rutledge, Esq. (PA62027)
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone:  (412) 391-5164
Facsimile:  (412) 471-1033
Email: yateslaw@aol.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
Francis P. McConville
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100

Facsimile:  (212) 661-8665

***Attorneys for Plaintiff***