## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRIAN H. ROBB, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:14-cv-01287-DSC |
| Plaintiff, | **CLASS ACTION** |
| v. | |
| EDUCATION MANAGEMENT CORPORATION, EDWARD H. WEST, RANDALL J. KILLEEN, and MICK J. BEEKHUIZEN, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiff Brian H. Robb ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Education Management Corporation, ("EDMC" or the "Company"), analysts' reports and advisories about the Company, review of pleadings in related actions, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired EDMC securities between July 1, 2011 and September 16, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     EDMC is one of the largest for-profit education companies in the United States, with its headquarters located in Pittsburgh, Pennsylvania.  The Company offers academic programs to students through campus-based and online instruction to earn undergraduate and graduate degrees, including doctoral degrees, and specialized non-degree diplomas in a range of disciplines.  EDMC operates 110 locations across 32 states of the United States and Canada.  Its shares previously traded on the NASDAQ under the ticker symbol "EDMC" but were voluntarily delisted by the Company in November 2014.

3.     Historically, the Company touted itself as providing valuable educational opportunities to those who were unable to attend traditional colleges and universities, such as low-income individuals and working adults.  However, following a leveraged buyout by a consortium of private equity investors led by Goldman Sachs in 2006 and then an initial public offering in 2009 by the same consortium, EDMC's business model radically changed.  Rather than focusing on the educational needs of students, the Company determined to increase profits by tapping into newly-accessible sources of federal education funding available through Title IV of the Higher Education Act, 20 U.S.C. §§ 1070, *et seq* ("Title IV").

4.     During the Class Period, the Company derived approximately 77% of its revenues from federal education funds, such as the Pell grant and Stafford loan programs, available under Title IV.  In total, the Company has collected over $8 billion in revenues from Title IV programs since 2011.  Between 2011 and 2014, the Company also substantially increased the amount it collects from educational funding sources available to eligible U.S. veterans from $129 million in 2011 to approximately $195 billion in 2014, or roughly 7.9% of the Company's 2014 revenues.

5.     To keep the federal funds flowing, EDMC had to enroll students continually, or, as one former EDMC employee explained more colloquially, "put asses in seats."  For years, EDMC, like many for-profit education institutions, employed a no-holds-barred approach to achieve this goal, preying on the unemployed, under-qualified, and even the homeless to fill student rosters, while promising the dream of career training and a college education. Enrollment numbers soared, rising from 38,047 students in 2001 to nearly 200,000 students in online and traditional brick-and-mortar programs in 2010.

6.     Having targeted a population that was academically unprepared, a large percentage of students dropped out, often after attending only a few classes.  Nevertheless, so long as a student "posted" for a minimum of two classes, EDMC retained Title IV monies for that student, thereby generating revenues.  Meanwhile, despite promises of job placement and career assistance, even students who managed to complete classes frequently found themselves ill-qualified for jobs in their field of study and saddled with student loan debt.

7.     Then, on August 3, 2010, the United States Government Accountability Office ("GAO") issued a report ("GAO Report") in connection with a hearing held by the Health, Education, Labor and Pensions Committee (the "HELP Committee") concluding that for-profit

educational colleges, such as EDMC, had engaged in an illegal and fraudulent course of action designed to recruit students and overcharge the federal government for the cost of their education.

8.      Thereafter, the HELP Committee launched an investigation of such practices; the U.S. Department of Education ("DOE") released data showing that the loan repayment rates for enrollees at thirteen campuses operated by EDMC were below the proposed threshold of 35 percent required for federal loan program eligibility; and the Company disclosed that its enrollee default rates had significantly increased.  The GAO Report also disclosed information obtained in the course of an undercover investigation, which revealed that EDMC admissions representatives made "deceptive or otherwise questionable statements" to the GAO investigators.

9.      In response to the GAO report and Congressional investigation, several state authorities began investigating the Company, including the Attorney General's Office for the states of Colorado, New York, Florida, Kentucky, Massachusetts, and the City Attorney of the City of San Francisco.  In October 2010, the DOE of Education issued new regulations pertaining to certain aspects of the administration of Title IV programs, including requirements for state authorization, disclosure of information related to gainful employment, prohibition of payment of "incentive compensation" for enrolling students, and changes in the definition of what constitutes a substantial misrepresentation for Title IV purposes.  These new regulations became effective July 1, 2011.

10.      At the start of the Class Period, as the regulatory landscape shifted, EDMC assured investors that the Company was "committed to offering quality academic programs" and maintained standards "to identify those students who are best equipped to meet the requirements of their chosen fields of study and successfully complete their programs."  EDMC further

advised that, in response to the new rule changes, the Company "eliminated enrollment results as a component of compensation for our admissions representatives" and "strive[d] to maintain a culture of compliance within our organization…"

11.     Despite these assurances, it would soon become apparent that EDMC never really altered its business practices or strategy at all, and the purported "compliance culture" was non-existent.   Instead, perhaps fearing that the federal government could turn off the federal education funds spigot at any time, the Company re-doubled its efforts to increase enrollment – and the attendant revenues – at all costs, essentially seeking to maximize short-term gains at the expense of unsuspecting, vulnerable students.   At the same time, the Company used a variety of machinations, such as re-shuffling campuses and creating internal loan forgiveness and deferral programs, which created the appearance that the Company was in compliance with applicable regulations, but which, in actuality, only exacerbated the inherent problems with the Company's high student loan default rates, low graduation, and low gainful employment statistics.

12.     Thus, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (1) EDMC misrepresented the Company's job placement rates; (2) EDMC's predatory and deceptive recruiting and enrollment practices violated federal regulations and standards established by its accrediting bodies; (3) these practices place EDMC at risk of losing federal funding under Title IV; and (4) as a result of the foregoing, EDMC's public statements were materially false and misleading at all relevant times.

13.     As detailed further herein, the truth concerning the Company's deceptive business practices slowly emerged in a series of partial corrective disclosures.

14.     On July 30, 2012, Senator Tom Harkin, chairman of the Health, Education, Labor and Pensions Committee (the "HELP Committee") completed a two-year investigation of the for-profit college industry, and issued a report (the, "Harkin Report") filled with troubling statistics and findings regarding the for profit college industry, and specifically about EDMC. According to the Harkin Report, the Company had employed aggressive lending and recruiting practices, which resulted in a student body that is underprepared for college, generally unable to obtain gainful employment, and laden with a significant amount of debt.  The Harkin Report also noted that the Company had implemented "default management" programs, which, rather than solving the problem with student loan defaults, mainly served to prevent revocation of EDMC's federal financial aid eligibility.

15.     After the Harkin Report was published, the Company's shares fell almost 8% or $0.32, to close at $3.77 on July 30, 2012.

16.     On March 22, 2013 the Company filed a Form 8-K with the SEC, announcing that it received a subpoena from the Division of Enforcement of the Securities and Exchange Commission. The Form 8-K stated, in part:

> On March 19, 2013, Education Management Corporation (the "Company") received a subpoena from the Division of Enforcement of the Securities and Exchange Commission ("SEC") requesting documents and information relating to the Company's valuation of goodwill and to its bad debt allowance for student receivables. The Company intends to cooperate with the SEC in its investigation.

17.     On May 17, 2013 the Company filed a Form 8-K with the SEC, announcing that it received another subpoena from the Division of Enforcement of the Securities and Exchange Commission. The Form 8-K stated, in part:

> On May 13, 2013, Education Management Corporation (the "Company") received a subpoena from the Division of Enforcement of the Securities and Exchange Commission (the "SEC") requesting documents and information relating to the letters of credit the Company posted with the

U.S. Department of Education and the Company's compliance with the U.S. Department of Education's standards of financial responsibility for participation in Title IV programs. The Company intends to cooperate with the SEC in its investigation.

18.     On June 20, 2013, after the close of trading, the Company issued a press release and filed a Form 8-K with the SEC, announcing the termination of John M. Mazzoni, the President of The Art Institutes. In the Form 8-K, the Company stated, in part:

> On June 14, 2013, Education Management LLC (the "Company") and John M. Mazzoni, the President of The Art Institutes, agreed to terminate Mr. Mazzoni's employment with the Company effective July 14, 2013 (the "Departure Date"). In consideration of Mr. Mazzoni's (i) agreement to remain in the employment of the Company until the Departure Date and provide consulting services to the Company until December 31, 2013 and (ii) execution of a general release in favor of the Company and its affiliates and related parties pursuant to a Waiver and Release of Claims, the Company has agreed to pay Mr. Mazzoni the amounts he is entitled to receive upon a termination other than for Cause as defined in the employment agreement, dated December 7, 2006, between the Company and Mr. Mazzoni (the "Employment Agreement") and a fiscal 2013 Management Incentive Compensation Plan ("MICP") bonus at 100% of his target bonus, in addition to any amount that Mr. Mazzoni would have received under the fiscal 2013 MICP if executive officers of the Company receive payments for fiscal 2013 under the MICP.

19.     On this news, the Company's shares fell over 10% or $0.71, to close at $6.22 on June 21, 2013. On the next trading day, the Company's shares fell over 12% or $0.75, to close at $5.47 on June 24, 2013. The total drop over two trading days was over 21% or $1.46.

20.     On June 27, 2013, the Company filed a Form 8-K with the SEC, announcing the resignation of its Vice President, Controller and Chief Accounting Officer, Randall J. Killeen. The Form 8-K stated, in part:

> On June 24, 2013, Randall J. Killeen provided notice of resignation as Vice President, Controller and Chief Accounting Officer of Education Management Corporation (the "Company"). Mr. Killeen has agreed to continue to serve in his current position until the conclusion of the meeting of the Audit Committee of the Company's Board of Directors to consider the Company's financial results for fiscal 2013.

21.     On November 1, 2013, after the close of trading, the Company filed a Form 8-K

with the SEC, announcing the termination of its Chairman, Todd S. Nelson. The Form 8-K

stated, in part:

> On October 28, 2013, Education Management LLC (the "Company") and
> Todd S. Nelson, Chairman of the Board of Directors of the Company,
> agreed to terminate Mr. Nelson's employment effective November 8, 2013
> (the "Departure Date").

22.     On this news, the Company's shares fell almost 5.5% or $0.80, to close at $13.78

on November 4, 2013.

23.     On January 24, 2014, the Company filed a Form 8-K with the SEC, announcing

that it received inquiries from twelve states regarding the Company's business practices. The

Form 8-K stated, in part:

> Education Management Corporation (the "Company") announced today
> that it has received inquiries from twelve states regarding the Company's
> business practices. The Attorney General of the Commonwealth of
> Pennsylvania has informed the Company that it will serve as the point of
> contact for the inquiries related to the Company. The inquiries focus on
> the Company's practices relating to the recruitment of students, graduate
> placement statistics, graduate certification and licensing results, and
> student lending activities, among other matters. The Company believes
> that several other companies in the for-profit education industry have
> received similar inquiries. The Company intends to cooperate with the
> states involved.

24.     On this news, the Company's shares fell over 10% or $0.97, to close at $8.70 on

January 27, 2013.

25.     On September 16, 2014, after the close of trading, the Company filed a Form

12b-25 with the SEC, notifying the SEC that it would delay the filing of its Annual Report on

Form 10-K for the period ended June 30, 2014. As to the cause of the delay and the potential

restatement, the Company stated the following:

> We are unable to timely file our Report on Form 10-K for the fiscal year
> ended June 30, 2014 without unreasonable effort or expense due to

unresolved comments from the Division of Corporation Finance of the Securities and Exchange Commission (the "SEC") related to our revenue recognition and related bad debt reserve recorded upon student withdrawals from school.  We intend to file our June 30, 2014 Form 10-K upon resolution of these remaining comments raised by SEC.

26.     As a result of this news, shares of EDMC fell $0.12 or almost 10%, to close at $1.10 on September 17, 2014.

27.     On October 1, 2014, the Company issued a press release and filed a Form 8-K with the SEC, announcing that an exchange offer in connection with proposed restructuring which would wipe out most of EDMC's debt and make creditors the majority owners of the beleaguered operator of for-profit colleges.

28.     On October 8, 2014, the Company issued a press release and later filed a Form 8-K with the SEC, announcing that it had received a standard notice of delisting from the NASDAQ exchange as a result of the delay in filing its annual report on Form 10-K.

29.     On October 20, 2014, after the close of trading, the Company filed a Form 8-K with the SEC announcing the resignation of Robert G. Hrivnak, EDMC's Vice President, Controller and Chief Accounting Officer, effective as of October 24, 2014.

30.     As a result of this news, shares of EDMC fell $0.13 or 9.9%, to close at $1.18 on October 21, 2014.

31.     Finally, on October 23, 2014, after the close of trading, the Company issued a press release and filed a Form 8-K with the SEC, announcing that it intends to voluntarily delist its common stock from the Nasdaq Global Select Market and to subsequently deregister its common stock. In the press release, the Company stated, in part:

> PITTSBURGH, Oct. 23, 2014 - Education Management Corporation (NASDAQ: EDMC), one of the largest providers of post-secondary education in North America, today announced that it intends to voluntarily delist its common stock from The Nasdaq Global Select Market and to subsequently deregister its common stock under the Securities Exchange

Act of 1934, as amended (the "Exchange Act"). The company and its subsidiaries also intend to suspend their reporting obligations under the Exchange Act, which they are eligible to do because each class of their securities has fewer than 300 stockholders of record.

The company also intends to deregister its common stock with the SEC and become a non-reporting company under the Exchange Act. The company and its subsidiaries intend to file a Form 15 upon the effective date of the Nasdaq delisting. As of the date of the filing of the Form 15, the obligation of the company and its subsidiaries to file reports under the Exchange Act, including Forms 10-K, 10-Q and 8-K, will be immediately suspend.

32.     As a result of this news, shares of EDMC suffered a decline of $0.53 or over 46%, to close at $0.62 on October 24, 2014.

33.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

34.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

35.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

36.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

37.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

38.    Plaintiff, as set forth in the attached Certification, acquired EDMC securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

39.    Defendant EDMC is a Pennsylvania corporation with its principal executive offices located at 210 Sixth Avenue 33rd Floor Pittsburgh, PA 15222.  EDMC's common stock previously traded on the NASDAQ under the ticker symbol "EDMC."  In or about November 2014, the Company voluntarily delisted its securities from NASDAQ.

40.    Defendant Edward H. West ("West") has been employed by EDMC at all relevant times, having served as President and Chief Financial Officer from December 2008 to August 2012 and then becoming the Company's President, Director, and Chief Executive Officer ("CEO") in August 2012.  He has been a member of the Company's board of directors since October 2012.

41.    Defendant Randall J. Killeen ("Killeen") has served at all relevant times until his termination April 10, 2013 as the Company's Acting Chief Financial Officer. Also, at all relevant times until in or around October 2013, Killeen served as the Company's Vice President, Controller, and Chief Accounting Officer.

42.    Defendant Mick J. Beekhuizen ("Beekhuizen") has served as a director of the Company since October 2009.  Beekhuizen was the designee of Goldman Sachs Capital Partners, one of the entities that participated in the leveraged buyout of EDMC in 2006.  Beekhuizen has also been an employee of Goldman Sachs & Co. since at least 2010.  Starting from April 10,

2013, Beekhuizen also served as the Company's Executive Vice President and Chief Financial Officer.

43.     The defendants referenced above in ¶¶ 40 - 42 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### EDMC And The Growth Of The For-Profit Education Industry

44.     Founded in 1962, EDMC has grown to become one of the largest providers of post-secondary education in North America, with approximately 125,560 enrolled students, 20,800 employees, and $2.3 billion in net revenues as of the filing of the Company's last annual report in October 2014.  The Company offers academic programs to students through campus-based and online instruction to earn undergraduate and graduate degrees, including doctoral degrees and specialized non-degree diplomas in a range of disciplines. It operates 110 locations across 32 states of the United States and Canada through four segments: The Art Institutes, Argosy University, Brown Mackie Colleges, and South University.

45.     The Company's exponential growth is mainly attributable to increased demand for access to higher education and career training and deregulation of Title IV programs in the early 2000's, which allowed non-traditional educational institutions to become eligible to receive federal education funds for students requiring financial aid assistance, including those enrolled exclusively in online programs.

46.     Recognizing the unique opportunity to finance the Company's growth with a nearly unlimited stream of government monies, in 2006, Goldman Sachs and a small consortium of private equity investors, including Providence Equity Partners and Leeds Capital Partners, bought EDMC in a leverage buyout for $3.4 billion.  In total, EDMC took on $2 billion in debt to finance the purchase.  By the time of the Company's initial public offering in 2009, 50% of

EDMC's board was composed of members appointed by the leveraged buyout investors. Throughout the Class Period, a majority of the Company's stock was also owned by the same investors.

47.     With Goldman Sachs and the leveraged buyout investors at the helm, EDMC embarked on an aggressive growth campaign.  Enrolling new students, at all costs and above all other considerations, became the focus of the administration.  The "admissions staff," comprised primarily of career salespeople with no experience in the academic area, grew from 950 to 2,600 nearly overnight, and representatives were trained in traditional sales techniques.

48.     As enrollment numbers soared, Title IV dollars came pouring in.  Today, EDMC's business is highly dependent on the availability of federal financial aid dollars through Title IV programs, such as the Federal Pell Grant Program ("Pell"), the Federal Family Education Loan Program ("FFELP"), and the Federal Direct Loan Program ("FDLP").  Since 2011, the Company has collected over $8 billion from Title IV programs, amounting to roughly 77% of the Company's net revenues.  Between 2011 and 2014, the Company also substantially increased the amount it collects from educational funding sources available to eligible U.S. veterans from $129 million in 2011 to approximately $195 billion in 2014, adding approximately 7.9% to the Company's 2014 revenues.

**The For-Profit Education Industry Comes Under Scrutiny**

49.     Educational institutions, including EDMC, are required to comply with regulatory requirements in order to continue participating in Title IV programs.  The regulations are intended to protect these resources – financed by taxpayers – from abuse.  Specifically, in order to receive Title IV funding, a student must attend a school that has entered into a program participation agreement ("PPA") with the U.S. Department of Education ("DOE").  20 U.S.C. §

1094(a); 34 C.F.R. §668.14.  Pursuant to the PPA, the university must certify that its educational institutions are compliant with various regulations.

50.     Any act which violates the HEA, including falsely certifying that an institution's schools are entirely compliant with HEA regulations or submitting false PPA's, threatens an institution's ability to receive Title IV funding.  In addition, violations of the HEA can subject the institution to substantial fines, including in some cases, treble damages.

51.     One key provision that educational institutions must comply with in order to receive Title IV funding is the "Incentive Compensation Ban."  Section 487(a)(20) of Title IV of the HEA, 20 U.S.C. § 1094(a)(20) requires that schools "will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance…"

52.     On August 3, 2010 the United States Government Accountability Office ("GAO") issued a report concluding that for-profit educational colleges such as EDMC had engaged in an illegal and fraudulent course of action designed to recruit students and overcharge the federal government for the cost of such education. Thereafter, a Congressional Committee, led by Senator Tom Harkin, launched an investigation of such practices.

53.     Over the course of the following two years, and in response to the GAO report and Congressional investigation, at least twelve state authorities began investigating the Company.

54.     In response to reports of similar misconduct by other for-profit education companies, in October 2010, the DOE adopted new regulations to improve the integrity in the programs authorized under Title IV (the "Program Integrity Rules"), which became effective on

July 1, 2011.  The Program Integrity Rules established new compliance requirements, including, among other things: (i) requiring disclosure of graduation and job placement rates; (ii) eliminating "safe harbor" provisions related to payment of incentive compensation; (iii) instituting policies to track student academic progress; and (iv) clarifying minimum requirements for state authorization of postsecondary programs.  Additionally, the Program Integrity Rules re-defined what constitutes a "substantial misrepresentation" in connection with statements made to prospective students and strengthens the DOE's authority to take action against institutions engaging in deceptive advertising, marketing, and sales practices.

55.     The Program Integrity Rules also created a "gainful employment" rule designed to provide students with better information about the value of programs, in particular, whether they lead to gainful employment in recognized occupations.  The rule required calculation of statistics concerning costs, debt levels, job placement rates, and earnings post-graduation.

56.     On October 30, 2014, the DOE released a new, final gainful employment rule, which requires schools to certify that their gainful employment programs meet federal and state certification, accreditation and licensure requirement and to meet certain minimum debt-to-earnings benchmarks.  These new regulations take effect July 1, 2015.

57.     In addition to maintaining compliance with the Program Integrity Rules, recipients of Title IV monies are also required to report the percentage of revenues derived from Title IV programs (the "90/10 Rule").  Specifically, an institution will cease to be eligible to participate in Title IV programs if more than 90% of its revenues for each of two consecutive fiscal years are derived from Title IV programs.  For purposes of the 90/10 Rule, an "institution" is defined as a main campus and its additional locations.  As of June 30, 2014, EDMC, for example, had 18 main campuses and a total of 110 locations.

15

58.     Institutions must also report the percentage of students defaulting on federal student loans (the "Cohort Default Rate" or "CDR").  Beginning in September 2012, the DOE calculated student loan default rates using both a two-year and a three-year methodology, *i.e.*, the percentage of students entering repayment who defaulted within two federal fiscal years and the percentage of students entering repayment who defaulted within three fiscal years.  An institution's CDR must not exceed 25% in each of the three most recent federal fiscal years or 40% for any single fiscal year.  Alternatively, the CDR must not exceed 30% when using the three-year calculation methodology.

**EDMC Claims To Reform**

59.     In the face of increased regulatory pressure, government investigations, and *qui tam* lawsuits, EDMC promised to reform the widespread abuses that had exposed the Company to fines and penalties and threatened its continued eligibility to receive Title IV funds.

60.     As recently as June 2014, EDMC strongly contended that:

> [The Company] maintains a deep commitment to doing things right by our students, regulatory bodies and our own internal principles by seeking to maintain the highest ethical standards and adhere to all legal and regulatory requirements on all matters…
>
> We are proud of the compliance measures that have been established with regard to transparency and accountability [regarding recruiting and marketing practices].  For example, student consumer information pages can easily be found on every school website, including required and voluntary disclosure on such things as job placement rates, financial aid, tuition, housing data, career service information and more.  We strive to help prospective students become informed consumers.

61.     As described in detail herein, in actuality, the same abusive enrollment, marketing, and financial accounting practices that had subjected the Company to regulatory scrutiny have continued unabated.

## FALSE AND MISLEADING STATEMENTS

### *EDMC's Inflation Of Job Placement Rates*

62.     EDMC markets itself as a career-focused school and entices student to enroll by offering the prospect of better jobs and higher wages. To market its programs, EDMC uses job placement data to lure students as well as to satisfy regulators and accrediting agencies that the schools are performing adequately and to maintain access to Title IV funding.

63.     Under the Higher Education Act ("HEA"), institutions like EDMC "must make available to any enrolled student or prospective student through appropriate publications, mailings or electronic media, information concerning … [t]he placement of, and types of employment obtained by, graduates of the institution's degree or certificate programs.… The institution must identify the source of the information provided in compliance with this paragraph, as well as any time frames and methodology associated with it." 34 C.F.R. § 41. Furthermore, "[t]he institution must disclose any placement rates it calculates." *Id.*

64.     In addition, state authorization and accreditation by an accrediting commission recognized by the DOE are required for a "for-profit" institution to become and remain eligible for Title IV funding. For example, standards established by the Accrediting Council for Independent Colleges and Schools ("ACICS"), which accredit most of EDMC's Art Institute campuses, require each accredited institution to maintain a benchmark employment rate of 65% for programs longer than one year. An institution with placement rates not meeting this benchmark may be subject to reporting and risk losing federal Title IV funding.

65.     Unbeknownst to the market and investors, because of the stringent reporting requirements imposed on EDMC by these rules and regulations, and in order to maintain the all-important Title IV funding, Defendants consistently manipulated and misrepresented the Company's job placement rates throughout the Class Period.

### _False and Misleading Statements Regarding Job Placement_

66.   On August 30, 2011, the Company filed an annual report on Form 10-K with the SEC for the fiscal year ended June 30, 2011. In the 10-K the Company stated the following regarding its job placement statistics:

> Graduate Employment
>
> We measure our success as an educator of students to a significant extent by the ability of our students to find jobs in their chosen field of employment upon graduation from our schools. Most of our schools provide career development instruction to our students in order to assist the students in developing essential job-search skills. In addition to individualized training in interviewing, networking techniques and resume writing, most of our schools require students to take a career development course. Additionally, we provide ongoing employment resources to our undergraduate students and recent graduates. Career services departments also assist current students in finding part-time employment while attending school. Students in certain of our Doctorate programs spend up to a year in a paid internship in their chosen field.
>
> *          *          *
>
> Based on information collected by us from graduating students and employers, we believe that, of the approximately 18,200 undergraduate students who graduated from our schools other than Argosy University during the calendar year ended December 31, 2010, approximately 82% of the available graduates obtained employment in their fields of study, or in related fields of study, within six months of graduation.

67.   On October 27, 2011, the Company hosted a conference call to discuss first fiscal quarter results for the period ending September 30, 2011. During the conference call, Defendant Nelson stated, in Part:

> Of our undergraduate students, excluding Argosy University, available for employment who graduated during the quarter ended this past March, approximately 80% were employed in their fields and related fields within 6 months to graduation.

68.     On February 2, 2012, the Company hosted a conference call to discuss second fiscal quarter results for the period ending December 31, 2011. During the conference call, Defendant Nelson stated, in Part:

> I'd like now to provide a brief update of our graduate statistics -- of our undergraduate students excluding Argosy University available for employment who graduated during the quarter ended this past year, approximately 76% were employed in their fields or related fields within six months of graduation.

69.     On May 3, 2012, the Company hosted a conference call to discuss third fiscal quarter results for the period ending March 31, 2012. During the conference call, Defendant Nelson stated, in Part:

> Of our undergraduate students, excluding Argosy University available for employment that graduated during the first quarter -- excuse me, during the quarter ended this past September (sic) [March], approximately 75% were employed in their fields or related fields within 6 months of graduation.

70.     On August 9, 2012, the Company hosted a conference call to discuss fourth fiscal quarter results and annual results for the period ending June 30, 2012. During the conference call, Defendant Nelson stated, in Part:

> So going forward, although post-secondary education faces many significant challenges, we see significant opportunities for education providers to deliver quality education for their students. Despite these challenges, we are pleased with the success our graduates have in the job market for graduation.
>
> Based on the Gainful Employment Program data provided by the Department of Education for completers, from fiscal years 2007 and 2008, the graduates from our programs in calendar year 2010 are an approximately 5% more on average than the graduates from all other institutions measured that offer the same programs.
>
> *       *       *
>
> While experiencing some slight improvements in average starting salaries, our graduate employment statistics continued to be impacted by the struggling economy, high unemployment and anemic job growth. Our

undergraduates students excluding Argosy University available for employment and graduated during the quarter ended this past December, approximately 75% were employed in our field or related fields within six months of graduation.

\*       \*       \*

In addition, for our undergraduate students, excluding Argosy University, available for employment graduated during the calendar year 2011, approximately 77% were employed in their fields or related fields within six months of graduation.

71.     On September 12, 2012, the Company filed its annual report for the period ending June 30, 2012 on Form 10-K with the SEC (the "2012 Annual Report").  With respect to career services and placement, the Company stated: "[O]ur staff of trained, dedicated career services specialists maintain strong relationships with employers in an effort to improve our graduate employment rates for our students in their chosen fields."

72.     The Company also claimed:

[W]e provide ongoing employment resources to our undergraduate students and recent graduates.  Many career services departments also assist current students in finding part-time employment while attending school. …

As of June 30, 2012, the career services departments of our schools had approximately 310 full-time employees.  We estimate that our career services departments maintain contact with approximately 70,000 employers nationwide.

Based on information collected by us from graduating students and employers, we believe that, of the approximately 22,300 undergraduate students who graduated from our schools … during the calendar year ended December 31, 2011, **approximately 77% of the available graduates obtained employment in their fields of study, or in related fields of study, within six months of graduation**.

73.     On November 1, 2012, the Company hosted a conference call to discuss first fiscal quarter results for the period ending September 30, 2012. During the conference call, Defendant West stated, in Part:

> We are beginning to see slight improvements in both the average starting salaries and employment rate for the graduates of our undergraduate programs. Of our undergraduate students who graduated during the quarter ended March 31 from our colleges and universities, including Argosy University, and were available for employment, approximately 76% became employed in their fields or related fields of study within 6 months of graduation with an average starting salary of approximately $30,100.

74.     On January 31, 2013, the Company hosted a conference call to discuss second fiscal quarter results for the period ending December 31, 2012. During the conference call, Defendant West stated, in Part:

> During the first six months of fiscal 2013, we had approximately 15,000 graduates, up slightly versus the prior year. Of our graduate students who graduated during the – of our undergraduate students who graduated during the quarter ended June 30, 2012 from all of our colleges and universities and were available for employment are approximately 74% became employed in their fields or related fields of study within six months of graduation with an average starting salary of approximately $30,000.

75.     On May 2, 2013, the Company hosted a conference call to discuss third fiscal quarter results for the period ending March 31, 2013. During the conference call, Defendant West stated, in Part:

> During the first 9 months of fiscal 2013, we have had over 20,000 graduates, up slightly versus the prior year. Of our undergraduate students who graduated during the quarter ended September 30, 2012, from all of our colleges and universities and were available for employment, approximately 75% became employed in their fields or related fields of study within 6 months of graduation, with an average starting salary of approximately $29,200.

76.     On August 8, 2013, the Company hosted a conference call to discuss fourth fiscal quarter results and annual results for the period ending June 30, 2013. During the conference call, Defendant West stated, in Part:

> Of our undergraduate students who completed their studies during the quarter ended December 31, 2012, from all of our colleges and universities and were available for employment, approximately 76% secured employment in their fields or related fields of study within 6

months of graduation, with an average starting salary of approximately $30,000.

77.     On September 3, 2013, the Company filed its annual report for the period ending June 30, 2013 on Form 10-K with the SEC (the "2013 Annual Report"). With respect to career services and placement, the Company stated: "[O]ur staff of trained, dedicated career services specialists maintain strong relationships with employers in an effort to improve our graduate employment rates for our students in their chosen fields."

78.     The Company also claimed:

> [W]e provide ongoing employment resources to our undergraduate students and recent graduates.  Many career services departments also assist current students in finding part-time employment while attending school. …
>
> As of June 30, 2013, the career services departments of our schools had approximately 330 full-time employees that maintain contact with employers nationwide.
>
> Based on information collected by us from graduating students and employers, we believe that, of the approximately 23,600 undergraduate students who graduated from our schools … during the calendar year ended December 31, 2012, **approximately 75% of the available graduates obtained employment in their fields of study, or in related fields of study, within six months of graduation**

79.     On October 31, 2013, the Company hosted a conference call to discuss first fiscal quarter results for the period ending September 30, 2013. During the conference call, Defendant West stated, in Part:

> Of our undergraduate students who completed their studies during the quarter ended March 31 of 2013 and were available for employment, approximately 77% secured employment in their fields or related fields of study within 6 months of graduation with an average starting salary of approximately $29,000.

80.     On October 16, 2014, the Company filed its annual report for the period ending June 30, 2014 on Form 10-K with the SEC (the "2014 Annual Report"). With respect to career

services and placement, the Company stated: "[O]ur staff of trained, dedicated career services specialists maintain strong relationships with employers in an effort to improve our graduate employment rates for our students in their chosen fields."

81.     The Company also claimed: [W]e provide ongoing employment resources to our undergraduate students and recent graduates.  Many career services departments also assist current students in finding part-time employment while attending school. …"

82.     Notably, the Company did not provide a job placement statistic for undergraduates completing programs during the calendar year ending 2013 as it had in prior years.

### *Why Defendants' Statements Were False and Misleading*

83.     The aforementioned statements were false and misleading because, according to information gained from confidential witnesses, the actual job placement rate was much lower and had been subject to manipulations and assumptions not disclosed to investors.

84.     According to CW1, a former director of career services at the Art Institute of Pittsburgh from September 2011 to October 2012, the career placement office consisted of a staff of only seven people, who were overwhelmed trying to find jobs for hundreds of new graduates each quarter.  CW1 explained that many of these purported graduates lacked networking and interviewing skills and had no idea had to find a job in their field of study.  Many students also had debt and personal circumstances that compelled them to take any job so that they could start earning a paycheck.

85.     CW1 further explained that he initially thought his job included developing relationships with area employers and creating more internship opportunities for students, but he

said that EDMC was only focused on placement numbers, without regard to really delivering on the promise to improve students' career prospects.

86.    Consequently, the job placement statistics many of these students were quoted when they were recruited did not always reflect reality.  For example, CW1 explained that EDMC counted high salaried job placements as having met the federal government's requirements dictating what counts as a placement within the student's field of study even when the job was completely in unrelated field.

87.    Similarly, EDMC manipulated job placement statistics by defining "field related employment" very broadly and counting students as "employed" even if they had worked at a relevant job for only one day.  For example, Tony Cavalline, a graduate of the Art Institute of Pittsburgh, returned to the exact same position he held as a floral designer at a supermarket after graduation, but was nevertheless still counted as a successful placement in the graphic design program.  The supermarket where he worked was identified as an "advertising agency" in EDMC's files.  Mr. Cavalline told a reporter: "[EDMC] definitely did not place me or help me in that respect at all. I could have gotten the job I had job with no education.  I don't think they should be allowed to blatantly make up information."

88.    CW2, who was employed as an associate admissions director at EDMC's South University/Art Institute in Phoenix from June 2009 until October 2014, substantiated that this practice persisted despite the filing of several lawsuits against the Company: "If you're a business major and get a job at WalMart, you're working in business, so you're placed.  If you were an assistant in the photo department at J.C. Penney when you enrolled and returned to the same job after completion of your degree, you were placed in the career field of your program."

89.     EDMC also utilized estimated, rather than reported salaries, when advising students about job prospects.  This had the effect of convincing students to take on additional debt and remain enrolled on the promise of future employment opportunities, even though EDMC's interest in student outcomes was limited to the extent they "counted" for statistical reporting purposes.

90.     The reports of these confidential witnesses, who were employed by EDMC throughout the Class Period, are consistent with the public statements of other witnesses, including Jason Sobek, a former EDMC employee who filed a *qui tam* action against the Company based on internal EDMC documents related to job placement.

91.     According to Mr. Sobek, EDMC created two sets of job placement data – one for government regulators and another for prospective students and investors.  Mr. Sobek said that students who failed to get jobs in their field were often omitted from calculations in order to inflate the job placement statistics.  For example, Kacie Johnson, who completed an online associates degree in graphic design at the Art Institute, was never able to find a job in that field. However, EMDC records show that Ms. Johnson was not included in job placement numbers, because she had an "established career."  Ms. Johnson, who works as an aide at a dialysis clinic, said, "I don't make enough to afford the $45,000 in student loans that I have."

### EDMC's Misleading Enrollment Practices

92.     Enrollment growth is critical to the business success of a for-profit college like EDMC.  In order to meet revenue expectations, EDMC must recruit and enroll as many students as possible.  However, EDMC's enrollment practices must comply with Title IV regulations, including Program Integrity Rules regarding compensation of admissions representatives and

disclosure of information related to program requirements and costs, accreditation, and graduation and placement rates.

93.     Furthermore, in order to maintain its Title IV funding, EDMC was required to maintain applicable accreditation standards with respect to its recruiting practices. Under ACICS standards, these requirements include:

> "[R]ecruiting shall be ethical and compatible with the educational objectives of the institution…. The following minimums apply: (a) An institution shall ensure that any person or entity engaged in admissions or recruitment activities on its behalf is communicating current and accurate information regarding courses and programs, services, tuition, terms, and operating policies."

94.     Under guidelines established by the Southern Association of Colleges and Schools Commission on Colleges ("SACSCOC") which accredits a number of EDMC's Art Institutes and all EDMC schools organized under South University, these requirements include:

> Institutions avoid the following recruitment practices in order to comply with the Principles of Accreditation and U.S. Department of Education regulations:
> (a) assuring employment unless employment arrangements have been made and can be verified, (b) misrepresenting job placement and employment opportunities for graduates, (c) misrepresenting program costs . . . (e) **misrepresenting abilities required to complete intended program**.

95.     Throughout the Class Period, Defendants violated the applicable Title IV regulations and accreditation requirements thorough manipulative and misrepresented enrollment practices, including, *inter alia*, predatory enrollment of students unfit for college-level work, enrolling students that were registering only to obtain funds via student loans with no intention of completing any of the schools programs, and misrepresenting the cost of attendance to students.

96.     Unbeknownst to the market and investors, in order to comply with applicable regulatory and accreditation guidelines, and maintain EDMC's all-important Title IV funding,

Defendants consistently misrepresented the Company's enrollment practices throughout the Class Period.

### *False and Misleading Statements Regarding Enrollment Practices*

97.     On August 30, 2011, the Company filed an annual report on Form 10-K with the SEC. In the 10-K, the Company made the following statements regarding Enrollment Practices:

> Student Admissions and Retention
>
> **The admissions and entrance standards of each school are designed to identify those students who are best equipped to meet the requirements of their chosen fields of study and successfully complete their programs** . . . . Most of our schools interview prospective students to assess their qualifications, their interest in the programs offered by the school and their commitment to their education. In addition, the curricula, student services, education costs, available financial resources and student housing options, if applicable, are reviewed during interviews.
>
> We use a variety of tools designed to assess prospective students, stress the importance of time management and study skills, and ensure that students understand the responsibilities and obligations of funding their education. The Art Institutes, Argosy University and Brown Mackie Colleges, as well as our fully online programs, use various products to test the reading, writing and math skills of undergraduate students.

98.     On October 27, 2011, the Company hosted a conference call to discuss first fiscal quarter results for the period ending September 30, 2011. During the conference call, Defendant Nelson stated, in Part:2012 Q1 Conference call:

> Well, let me just deal with the first part of it and then let Ed attempt the second part. What does happen is that, again, although we've been dealing with non-term, not necessarily the borrower base. But is that -- again, there are students as we know and this is unfortunately exist through all of post-secondary education, it's not specific to the for-profits as we saw that recently. This has become a large trend in the non-profits, in the community college system especially. And that is that those students who may have been attending for the stipend, the amount that's available to them over and above what the school has for tuition. When they're not getting that, they're making the decision in many cases to not enroll any further. And we actually think that is a good thing, **we don't want students who has been characterized as those who are there for the stipends. That's not necessarily what we want to see.**

99.     On May 3, 2012, the Company hosted a conference call to discuss third fiscal quarter results for the period ending March 31, 2012. During the conference call, Defendant Nelson stated, in Part::

> **Let me just comment on the percentage of those who are may have been enrolling for the stipend.** I looked at some data yesterday from LHE [ph]. And really has -- you see a decline at both South University Online and Argosy University Online. And I think it's encouraging because, again, **we don't want students in there that's why they're attending.** And so that has been a nice transition.

100.    On September 12, 2012, the Company filed its annual report for the period ending June 30, 2012 on Form 10-K with the SEC (the "2012 Annual Report").  With respect to enrollment practices, the Company reiterated its prior statements that "[t]he admissions and entrance standards of each school are designed to identify those students who are best equipped to meet the requirements of their chosen fields of study and successfully complete their programs."  The 2012 Annual Report also repeated the assurances that: "Most of our schools interview prospective students to assess their qualifications … [T]he curricula, student services, education costs, available financial resources and student housing options, if applicable, are reviewed during interviews."  The 2012 Annual Report further stated: "We use a variety of tools designed to assess prospective students, stress the importance of time management and study skills, and ensure that students understand the responsibilities and obligations of funding their education."

101.    Regarding the Company's business practices related to admissions representatives, the 2012 Annual Report indicated that, in order to comply with new regulations, "we changed our evaluation and compensation practices for admissions and financial aid representatives and certain other employees."  Furthermore, the Company promised: "Each admissions representative undergoes a standardized training program, which includes a full

competency assessment at the program's conclusion.   We also require our admissions representatives to pass a compliance test on an annul basis and certify that they understand and comply with our recruiting standards."

102.   On September 3, 2013, the Company filed its annual report for the period ending June 30, 2013 on Form 10-K with the SEC (the "2013 Annual Report").   Once again, the 2013 Annual Report affirmed that "[t]he admissions and entrance standards of each school are designed to identify those students who are best equipped to meet the requirements of their chosen fields of study and successfully complete their programs," and repeated the statements from prior reports that "Most of our schools interview prospective students to assess their qualifications … [T]he curriculum, student services, education costs, available financial resources and student housing options, if applicable, are reviewed during interviews.   Like other annual reports, the 2013 Annual Report stated: "We use a variety of tools designed to assess prospective students, stress the importance of time management and study skills, and ensure that students understand the responsibilities and obligations of funding their education."

103.   The 2013 Annual Report reiterated the Company's statements that: "Each admissions representative undergoes a standardized training program, which includes a full competency assessment at the program's conclusion.   We also require our admissions representatives to pass a compliance test on an annul basis and certify that they understand and comply with our recruiting standards."

104.   On October 16, 2014, the Company filed its annual report for the period ending June 30, 2014 on Form 10-K with the SEC (the "2014 Annual Report").   With respect to enrollment practices, the Company reiterated its prior statements that "[t]he admissions and entrance standards of each school are designed to identify those students who are best equipped

to meet the requirements of their chosen fields of study and successfully complete their programs."  The 2014 Annual Report also repeated the assurances that: "Most of our schools interview prospective students to assess their qualifications … [T]he curricula, student services, education costs, available financial resources and student housing options, if applicable, are reviewed during interviews."  The 2014 Annual Report further stated: "We use a variety of tools designed to assess prospective students, stress the importance of time management and study skills, and ensure that students understand the responsibilities and obligations of funding their education."

105.    As in prior annual reports, the 2014 Annual Report stated: "Each admissions representative undergoes a standardized training program, which includes a full competency assessment at the program's conclusion.  We also require our admissions representatives to pass a compliance test on an annul basis and certify that they understand and comply with our recruiting standards."

### Why Defendants' Statements Were False and Misleading

106.    Defendants' aforementioned representations with respect to EDMC's enrollment practices were false and misleading, because they concealed the fact that despite the criticism leveled at the Company following the Harkin Report and despite implementation of the Program Integrity Rules, enrollment rates and growth *still* were highly dependent on enrolling unqualified and non-paying students as active students and churning thousands of applicants who dropped out quickly. Thus, EDMC's reported enrollment numbers were inflated artificially by recruitment of students unfit for college-level work or who were kept enrolled through manipulative grading and attendance practices. Admissions representatives were constantly threatened with termination if they failed to hit enrollment quotas; this intense pressure led to

recruiting and enrolling students who were unqualified, unlikely to complete programs, and unable to manage the debt load when they inevitably dropped out.

107.    Testimony from confidential witnesses confirms the Company's misleading and predatory enrollment practices, which, among other things, violated Program Integrity Rules. First, the role of an admissions representative remained mainly a sales job.  Having been forced to do away with incentive compensation, EDMC implemented a punitive, boiler-room type sales environment, described by one witness as a "classic American sweatshop," where representatives were under constant pressure to meet enrollment quotas or face termination.  CW3, who worked in several capacities, including president, assistant director of campus services, and director of student records at Brown Mackie College in Ft. Mitchell, Kentucky from September 2003 through August 2013, said that the change in company culture once Goldman Sachs came in "really shook [his] faith in the industry as a whole."

108.    CW3 further explained that the push to expand enrollment led some admissions representatives to fill out the actual enrollment forms for students.  This included completing sections of forms that asked students to list any obstacles they might face that could interfere with their education.  CW3 said that at that point, there was nothing in place to stop students from enrolling, taking out loans, and then dropping.  CW3 stated, "My thought was that they needed to discourage people like that from enrolling.  But they didn't care.  It was all about the numbers."

109.    Similarly, CW4 an assistant director of admissions for Brown Mackie College in Indianapolis from January 2011 to November 2013, confirmed that there was "constant negative feedback," and said she had an "ethical problem" with the Company due to the willingness of management to enroll anyone who walked in the door.  CW4 stated, "[T]hey took anybody and

everybody they could." CW4 described one case where an applicant was unable to read or write, but CW4's manager ordered that the applicant be enrolled anyway.   With CW4's encouragement, the applicant took out a student loan, flunked her first class, and dropped out. The student subsequently showed up at CW4's cubicle and berated CW4 for allowing her to enroll.  CW4 said this incident contributed to her decision to leave the Company.

110.    CW5, an admissions representative and admissions manager at EDMC's South University from May 2009 until July 2013, concurred with CW5, explaining that EDMC did away with admissions tests in about 2011 as management increased pressure to meet recruitment goals.  CW5 said that homeless people with little to no work experience, people with emotional problems, and others unfit for higher education were regularly placed by admissions officers.

111.    CW5 and CW2 also both described how EDMC generated leads by posting online advertisement offering prospective students credit cards and job opportunities in order to get their contact information.  Once EDMC obtained their information, it was passed to admissions representatives as recruitment leads.  "Some people were furious they were being contacted with a sales pitch for the school when they didn't seek it," said CW5.  CW2 simply stated, "It was a basic bait and switch tactic."

112.    When even these tactics did not suffice to put "asses in seats," in some instances, enrollment numbers were completely falsified.   According to CW6, a former employee of Argosy University from September 2008 through September 2013, who worked as an assistant director of admissions ("ADA") and was promoted to student success advisor ("SSA"), some ADAs would fill out bogus enrollment forms for potential students in order to meet their quotas. CW6 stated, "People would be enrolling their cousins, sisters, whatever and get them to stay for

the 30 days so they could get credit."  These "students" would then drop out without owing any money, but the ADA would still receive credit for the placement.

113.    CW2, an associate admissions director, substantiated the reports of other confidential witnesses.  CW2 said, "They increased [goals] all the time.  Enroll, enroll, enroll, enroll.  That's what the job was."  Under intense pressure, CW2 explained that students were enrolled irrespective of qualifications and without being adequately advised of the financial commitment: "We knew half of the students wouldn't show up for the first class and another half of those that did wouldn't show up for the second class.  And if they did stay in class we knew this was an investment of $100,000 or more and we had not discussed with them the job market of their chosen field of study."  Nevertheless, once students "posted" for a first class, EDMC was guaranteed at least $1400.

114.    CW7, a former assistant director of admissions for South University in Phoenix from March 2010 to March 2013, similarly explained, "We harassed [recruits] until they enrolled."  Thereafter, admissions representatives were told to walk students to their first two classes to make sure they showed up.  Once they "posted twice," they were responsible for the tuition, regardless of whether they completed the course.

115.    CW7 also said that admissions representatives were ordered to contact students who dropped out of classes to convince them to re-take the course.  In this manner, EDMC would receive financial aid dollars twice for the same class, even if a student was not actually making any progress.

### EDMC's Regulatory Failures

116.    As detailed herein, regulations require EDMC to: (1) maintain a Cohort Default Rate on federally guaranteed loans below certain specified rates for both a two-year and three-

year reporting period; (2) ensure that 90% or less of the Company's revenues are derived from Title IV programs pursuant to the 90/10 Rule; (3) comply with certain financial responsibility and administrative capability standards; (4) prohibit the payment of certain incentives to personnel engaged in student recruiting, admissions activities or the award of financial aid; (5) prohibit the making of substantial representations in connection with recruiting and marketing activities; and (6) achieve prescribed completion and placement outcomes for certain academic programs.

117.    Specifically, in order to maintain access to federal Title IV funds, institutions like EDMC must maintain an appropriate Cohort Default Rate.  The CDR calculates (i) a percentage of a school's borrowers who enter repayment on federal student loans during a fiscal year and default prior to the end of the next fiscal year (*i.e.*, the two-year CDR rate), and (ii) a percentage of a school's borrowers who enter repayment on federal student loans during a fiscal year and default prior to the end of the second succeeding fiscal year (*i.e.*, the three-year CDR rate). According to the Higher Education Act, an institution's two-year CDR must not exceed 25% in each of the three most recent federal fiscal years or 40% for any single fiscal year, and the three-year CDR must not exceed 30%.  *See*, *e.g.*, 34 C.F.R. §§ 668.187; 668.206.

118.    Recipients of Title IV monies are also required to report the percentage of revenues derived from Title IV programs (the "90/10 Rule").  Specifically, an institution will cease to be eligible to participate in Title IV programs if more than 90% of its revenues for each of two consecutive fiscal years are derived from Title IV programs.  For purposes of the 90/10 Rule, an "institution" is defined as a main campus and its additional locations.

119.    In October 2010, the DOE adopted the Program Integrity Rules, which became effective on July 1, 2011.  The Program Integrity Rules established new compliance

requirements, including, among other things: (i) requiring disclosure of graduation and job placement rates; (ii) eliminating "safe harbor" provisions related to payment of incentive compensation; (iii) instituting policies to track student academic progress; and (iv) clarifying minimum requirements for state authorization of postsecondary programs. Additionally, the Program Integrity Rules re-defined what constitutes a "substantial misrepresentation" in connection with statements made to prospective students and strengthens the U.S. Department of Education's authority to take action against institutions engaging in deceptive advertising, marketing, and sales practices.

120.    Prior to the June 30, 2012 federal court ruling vacating certain gainful employment measures, EDMC was also required to meet gainful employment standards, including (1) at least 35% of the program's former students must be repaying their loans, (2) the estimated annual loan payment of a typical graduate could not exceed 12% of the graduate's total earnings, and (3) the estimated total loan payment of a typical graduate could not exceed 30% of the graduate's discretionary income. On October 30, 2014, the DOE released a new, final gainful employment rule, which requires schools to certify that their gainful employment programs meet federal and state certification, accreditation and licensure requirement and to meet certain minimum debt-to-earnings benchmarks. These new regulations take effect July 1, 2015.

121.    Defendants knew that violating these applicable regulations would put the Company's accreditation and all-important Title IV federal funding eligibility at risk. Because Title IV funds are the life blood of EDMC's business, loss of its eligibility to participate in Title IV programs would sound a corporate death knell for the Company

122.     Indeed, the vast majority of EDMC's revenue during the Class Period was generated from federal Title IV financial aid funds.  The Company derived as much as 77%, or $8 billion, of its annual revenue from Title IV funding during the Class Period.

123.     During the Class Period, the Company continually touted its compliance efforts, stating, for example, in its annual report in 2014, for example, "We strive to maintain a culture of compliance within our organization with the numerous laws and regulations that govern our business and operations."

124.     Despite Defendants' representations, the compliance efforts of the Company, including the default management program, served only to perpetuate the inherent issues with the Company's high student default rates and low graduation and gainful employment statistics. The Company's compliance measures were in fact nothing more than a small bandage over a deep and festering wound, which jeopardized the Company's core operational health.

### *False and Misleading Statements Regarding Compliance*

125.     On August 9, 2012, the Company hosted a conference call to discuss its fourth quarter results.  During the Q4 2012 Conference Call, Defendants made the following statement regarding the Company's compliance efforts:

> The value of an education continues to be extremely high and somebody needs to provide that, again the quality education and our view of that is that we have excellent programs and we are going to do that, and obviously we are navigating that at the beginning for a very challenging, financial and regulatory environment. **But we feel like we have the team that is assembled to be able to do that going forward.** So we do see again in the midst of these challenges some incredible opportunities and that's our goal to execute on those.

126.     On September 12, 2012, the Company filed its annual report for the period ending June 30, 2012 on Form 10-K with the SEC (the "2012 Annual Report").  With respect to compliance, the Company stated: "We strive to maintain a culture of compliance within our

organization with the numerous regulations that govern our business and operations."  Among the Company's compliance efforts, the 2012 Annual Report explained: "We also require our admissions representatives to pass a compliance test on an annual basis and certify that they understand and comply with our recruiting standards."

127.    Regarding compliance with the 90/10 Rule, the 2012 Annual Report stated: "For our institutions that disbursed federal financial aid during fiscal 2012, the percentage of revenues derived from Title IV programs ranged from approximately 56% to 86%, with a weighted average of approximately 79% as compared to a weighted average of approximately 78% in fiscal 2011.

128.    Regarding compliance with cohort default rates, the 2012 Annual Report stated: "None of our schools has had a FFEL/Direct Loan Two-Year [Cohort Default Rate] of 25% or greater for the last three consecutive federal fiscal years."  The 2012 Annual Report also included tables of two-year and three-year cohort default rates for each of its institutions, all of which appeared to be compliant with applicable regulations.

129.    On September 3, 2013, the Company filed its annual report for the period ending June 30, 2013 on Form 10-K with the SEC (the "2013 Annual Report").  With respect to compliance, the Company stated: "We strive to maintain a culture of compliance within our organization with the numerous regulations that govern our business and operations."  Among the Company's compliance efforts, the 2013 Annual Report explained: "We also require our admissions representatives to pass a compliance test on an annual basis and certify that they understand and comply with our recruiting standards."

130.    Regarding compliance with the 90/10 Rule, the 2013 Annual Report stated: "For our institutions that disbursed federal financial aid during fiscal 2013, the percentage of revenues

derived from Title IV programs ranged from approximately 56% to 82%, with a weighted average of approximately 76% as compared to a weighted average of approximately 79% in fiscal 2011.

131.    Regarding compliance with cohort default rates, the 2013 Annual Report stated: "None of our schools has had a FFEL/Direct Loan Two-Year [Cohort Default Rate] of 25% or greater for the last three consecutive federal fiscal years."   The 2013 Annual Report also included tables of two-year and three-year cohort default rates for each of its institutions, all of which appeared to be compliant with applicable regulations.

132.    On October 16, 2014, EDMC filed its annual report on Form 10-K with the S.E.C., in which the Company stated: "We strive to maintain a culture of compliance within our organization with the numerous laws and regulations that govern our business and operations." The 2014 Annual Report further stated: "The proprietary education industry has come under a significant level of scrutiny in the last few years, with numerous regulatory and enforcement agencies launching investigations and adopting new rules and regulations.  In response, we have increased our emphasis on compliance efforts across our education systems."   Among the Company's compliance efforts, the 2014 Annual Report explained: "We also require our admissions representatives to pass a compliance test on a semi-annual basis and certify that they understand and comply with our recruiting standards."

133.    Regarding compliance with the 90/10 Rule, the 2014 Annual Report stated: "For our institutions that disbursed federal financial aid during fiscal 2014, the percentage of revenues derived from Title IV programs ranged from approximately 55% to 81%, with a weighted average of approximately 76% as compared to a weighted average of approximately 76% in fiscal 2013.

134.    Regarding compliance with cohort default rates, the 2014 Annual Report included tables of two-year and three-year cohort default rates for each of its institutions, all of which appeared to be compliant with applicable regulations.

### Why Defendants' Statements Were False and Misleading

135.    Throughout the Class Period, Defendants fostered the belief that the Company's ability to remain within the regulatory requirements for the 90/10 Rule and the Cohort Default Rates was the product of reformed enrollment practices and a "culture of compliance." In actuality, Defendants employed numerous devices to manipulate the calculation of the statistics, without altering any of the business practices that had subjected the Company to lawsuits and regulatory investigations.

136.    For example, with respect to the 90/10 Rule, the Company implemented several "internal scholarships" for students so that a portion of their tuition could be counted towards the 10% portion of revenues that was supposed to come from non-Title IV sources.  According to CW6, EDMC also counted tuition reimbursement paid to its own employees taking EDMC classes as part of the 10% non-Title IV revenues.  It was worth the expense to EDMC to bolster the numbers on the 10% side of the 90/10 equation in order to keep the Title IV revenues below the permissible 90% level.

137.    During CW6's tenure, CW6 explained that the Company also increased its focus on military recruitment, because the money received by veterans for re-training did not count as "financial aid" for purposes of maintaining compliance with the 90/10 Rule.  In other words, because federal education benefits for veterans are paid through military programs, most notably the Post-9/11 GI Bill, and not Title IV, those monies are not included in the percentage of revenues derived from Title IV sources, even though they all come from federal coffers.

Significantly, EDMC's revenues from military sources increased from $129 million in 2011, to $163 million in 2012, $176.4 million in 2013, and $195.1 million in 2014.  The expansion of military recruitment helped offset the percentage of revenues derived from Title IV programs, thus allowing EDMC to consistently report that approximately 77% of its revenues came from Title IV without significant variation.

138.     Summarizing his experiences and observations, CW6 said, "Goldman Sachs was a brilliant mother ship.  They really knew how to manipulate the numbers."

139.     In addition, CW3 said that starting in 2010, EDMC reorganized all its schools for reporting purposes, for example, by placing Brown Mackie in Kentucky under the auspices of the Art Institute in Phoenix. The schools had nothing in common except their corporate parent. CW3 explained that this was done to get around the 90/10 Rule.  Specifically, EDMC must calculate and report its receipt of Title IV funds for each of its institutions.  An institution is defined as a main campus with associated locations under the rules.  By shuffling campuses and locations, EDMC could cherry-pick among schools and combine each of their individual statistics related to receipt of Title IV monies to achieve technical compliance with the 90/10 Rule.  For example, CW3 explained that tuition at the Art Institutes was higher than at Brown Mackie, and 20% of the tuition was non-Title IV.  This could be utilized to offset Brown Mackie campuses where a greater percentage of revenues were comprised of Title IV funds.  CW3 stated, "It's almost like they sat around and said, 'Okay, let's put this school, this school, and this school together so we can make 90/10."

140.     With respect to the Cohort Default Rate, CW6 said that the Company instituted several programs designed to disguise students' inability to repay their debt.  For example, CW6 and CW9, a Payment Specialist for EDMC's Argosy University in Chicago from May 2012 to

March 2014, both described the "F" Forgiveness program, where EDMC would agree to write off half the tuition for students who failed a class if they paid EDMC the remaining half.  For students that still could not pay, EDMC would offer to loan them the outstanding balance, even though the Company was aware that the students were unlikely to ever repay the loan.  The reasons for extending credit in this manner were twofold:  first, it created the impression that students were not defaulting on loans, thereby keeping the Cohort Default Rates within allowable limits, and second, it enabled EDMC to count the students as attending and still eligible for Title IV monies, even though they had failed classes and otherwise would have dropped out.

141.    Likewise, CW8, a director of student financial services for the Art Institute of Dallas from March 2009 to August 2013, discussed several loan forgiveness programs, which in CW8's view, were used by EDMC to "juice the revenue stream."  CW8 noted that the push to get students into these programs usually coincided with the release of quarterly earnings statements.

142.    CW9 also said that students were permitted to start classes before payment was received.  This allowed students to remain enrolled and therefore, counted for Title IV purposes, even though they had outstanding balances from previous semesters.  CW9 noted, "The vast majority of students were on payment plans."

143.    Similarly, CW10, who worked as the director of finance and administration for the Art Institute in California from September 2009 to November 2013, said that management encouraged schools to load up on students without worrying about their ability to pay.  "The [accounts receivables] would grow and grow and grow.  It was absolutely maddening from a financial point of view.  People didn't pay their bills, and yet we would reward them by signing them up again and again."

144.    In terms of internal controls, very limited resources were devoted to ensuring that EDMC's numerous locations remained in compliance with federal regulations.  CW11, a former Assistant Director of Regulatory Compliance for EDMC in Pittsburgh from October 2013 to October 2014, and a former Compliance Review Coordinator for EDMC from November 2011 to October 2013, explained that EDMC's compliance efforts were reactive, rather than proactive, with individual colleges generating their own materials, which would eventually be filtered up to EDMC's compliance function for review.  CW11 said that some of EDMC's colleges were "really bad at communication."

145.    CW11 also said that in October 2014, five employees were laid off from the compliance department, leaving only one employee.  CW11 expressed astonishment at this decision: "Given the importance of the compliance role, this seem[ed] to make no sense."

146.    Consequently, as discussed in detail herein, contrary to Defendants' representations that the Company maintained a "culture of compliance," there remained rampant and unchecked abuse in terms of recruiting, enrollment, marketing, and financial aid practices throughout the Company, which violated applicable regulations, and in particular, the Company's continued eligibility to participate in Title IV programs.

## THE TRUTH EMERGES

147.    The truth concerning the Company's deceptive business practices slowly emerged in a series of partial corrective disclosures.

148.    On July 30, 2012, Senator Tom Harkin, chairman of the Health, Education, Labor and Pensions Committee (the "HELP Committee") completed a two-year investigation of the for-profit college industry, and issued a report (the, "Harkin Report") filled with troubling statistics and findings regarding the for profit college industry, and specifically about EDMC. According to the Harkin Report, the Company had employed aggressive lending and recruiting

practices, which resulted in a student body that is underprepared for college, generally unable to obtain gainful employment, and laden with a significant amount of debt. The Harkin Report also noted that the Company had implemented "default management" programs, which, rather than solving the problem with student loan defaults, mainly served to prevent revocation of EDMC's federal financial aid eligibility.

149.    After the Harkin Report was published, the Company's shares fell almost 8% or $0.32, to close at $3.77 on July 30, 2012.

150.    On March 22, 2013 the Company filed a Form 8-K with the SEC, announcing that it received a subpoena from the Division of Enforcement of the Securities and Exchange Commission. The Form 8-K stated, in part:

> On March 19, 2013, Education Management Corporation (the "Company") received a subpoena from the Division of Enforcement of the Securities and Exchange Commission ("SEC") requesting documents and information relating to the Company's valuation of goodwill and to its bad debt allowance for student receivables. The Company intends to cooperate with the SEC in its investigation.

151.    On May 17, 2013 the Company filed a Form 8-K with the SEC, announcing that it received another subpoena from the Division of Enforcement of the Securities and Exchange Commission. The Form 8-K stated, in part:

> On May 13, 2013, Education Management Corporation (the "Company") received a subpoena from the Division of Enforcement of the Securities and Exchange Commission (the "SEC") requesting documents and information relating to the letters of credit the Company posted with the U.S. Department of Education and the Company's compliance with the U.S. Department of Education's standards of financial responsibility for participation in Title IV programs. The Company intends to cooperate with the SEC in its investigation.

152.    On June 20, 2013, after the close of trading, the Company issued a press release and filed a Form 8-K with the SEC, announcing the termination of John M. Mazzoni, the President of The Art Institutes. In the Form 8-K, the Company stated, in part:

On June 14, 2013, Education Management LLC (the "Company") and John M. Mazzoni, the President of The Art Institutes, agreed to terminate Mr. Mazzoni's employment with the Company effective July 14, 2013 (the "Departure Date"). In consideration of Mr. Mazzoni's (i) agreement to remain in the employment of the Company until the Departure Date and provide consulting services to the Company until December 31, 2013 and (ii) execution of a general release in favor of the Company and its affiliates and related parties pursuant to a Waiver and Release of Claims, the Company has agreed to pay Mr. Mazzoni the amounts he is entitled to receive upon a termination other than for Cause as defined in the employment agreement, dated December 7, 2006, between the Company and Mr. Mazzoni (the "Employment Agreement") and a fiscal 2013 Management Incentive Compensation Plan ("MICP") bonus at 100% of his target bonus, in addition to any amount that Mr. Mazzoni would have received under the fiscal 2013 MICP if executive officers of the Company receive payments for fiscal 2013 under the MICP.

153.    On this news, the Company's shares fell over 10% or $0.71, to close at $6.22 on June 21, 2013. On the next trading day, the Company's shares fell over 12% or $0.75, to close at $5.47 on June 24, 2013. The total drop over two trading days was over 21% or $1.46.

154.    On June 27, 2013, the Company filed a Form 8-K with the SEC, announcing the resignation of its Vice President, Controller and Chief Accounting Officer, Randall J. Killeen. The Form 8-K stated, in part:

On June 24, 2013, Randall J. Killeen provided notice of resignation as Vice President, Controller and Chief Accounting Officer of Education Management Corporation (the "Company"). Mr. Killeen has agreed to continue to serve in his current position until the conclusion of the meeting of the Audit Committee of the Company's Board of Directors to consider the Company's financial results for fiscal 2013.

155.    On November 1, 2013, after the close of trading, the Company filed a Form 8-K with the SEC, announcing the termination of its Chairman, Todd S. Nelson. The Form 8-K stated, in part:

On October 28, 2013, Education Management LLC (the "Company") and Todd S. Nelson, Chairman of the Board of Directors of the Company, agreed to terminate Mr. Nelson's employment effective November 8, 2013 (the "Departure Date").

156.     On this news, the Company's shares fell almost 5.5% or $0.80, to close at $13.78 on November 4, 2013.

157.     On January 24, 2014, the Company filed a Form 8-K with the SEC, announcing that it received inquiries from twelve states regarding the Company's business practices. The Form 8-K stated, in part:

> Education Management Corporation (the "Company") announced today that it has received inquiries from twelve states regarding the Company's business practices. The Attorney General of the Commonwealth of Pennsylvania has informed the Company that it will serve as the point of contact for the inquiries related to the Company. The inquiries focus on the Company's practices relating to the recruitment of students, graduate placement statistics, graduate certification and licensing results, and student lending activities, among other matters. The Company believes that several other companies in the for-profit education industry have received similar inquiries. The Company intends to cooperate with the states involved.

158.     On this news, the Company's shares fell over 10% or $0.97, to close at $8.70 on January 27, 2013.

159.     On September 16, 2014, after the close of trading, the Company filed a Form 12b-25 with the SEC, notifying the SEC that it would delay the filing of its Annual Report on Form 10-K for the period ended June 30, 2014. As to the cause of the delay and the potential restatement, the Company stated the following:

> We are unable to timely file our Report on Form 10-K for the fiscal year ended June 30, 2014 without unreasonable effort or expense due to unresolved comments from the Division of Corporation Finance of the Securities and Exchange Commission (the "SEC") related to our revenue recognition and related bad debt reserve recorded upon student withdrawals from school. We intend to file our June 30, 2014 Form 10-K upon resolution of these remaining comments raised by SEC.

160.     As a result of this news, shares of EDMC fell $0.12 or almost 10%, to close at $1.10 on September 17, 2014.

161.    On October 1, 2014, the Company issued a press release and filed a Form 8-K with the SEC, announcing that an exchange offer in connection with proposed restructuring which would wipe out most of EDMC's debt and make creditors the majority owners of the beleaguered operator of for-profit colleges.

162.    On October 8, 2014, the Company issued a press release and later filed a Form 8-K with the SEC, announcing that it had received a standard notice of delisting from the NASDAQ exchange as a result of the delay in filing its annual report on Form 10-K.

163.    On October 20, 2014, after the close of trading, the Company filed a Form 8-K with the SEC announcing the resignation of Robert G. Hrivnak, EDMC's Vice President, Controller and Chief Accounting Officer, effective as of October 24, 2014.

164.    As a result of this news, shares of EDMC fell $0.13 or 9.9%, to close at $1.18 on October 21, 2014.

165.    Finally, on October 23, 2014, after the close of trading, the Company issued a press release and filed a Form 8-K with the SEC, announcing that it intends to voluntarily delist its common stock from the Nasdaq Global Select Market and to subsequently deregister its common stock. In the press release, the Company stated, in part:

> PITTSBURGH, Oct. 23, 2014 - Education Management Corporation (NASDAQ: EDMC), one of the largest providers of post-secondary education in North America, today announced that it intends to voluntarily delist its common stock from The Nasdaq Global Select Market and to subsequently deregister its common stock under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The company and its subsidiaries also intend to suspend their reporting obligations under the Exchange Act, which they are eligible to do because each class of their securities has fewer than 300 stockholders of record.
>
> The company also intends to deregister its common stock with the SEC and become a non-reporting company under the Exchange Act. The company and its subsidiaries intend to file a Form 15 upon the effective date of the Nasdaq delisting. As of the date of the filing of the Form 15, the obligation of the company and its subsidiaries to file reports under the

Exchange Act, including Forms 10-K, 10-Q and 8-K, will be immediately suspend.

166.     As a result of this news, shares of EDMC suffered a decline of $0.53 or over 46%, to close at $0.62 on October 24, 2014.

## ADDITIONAL SCIENTER ALLEGATIONS

167.     As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding EDMC, their control over, and/or receipt of modification of EDMC's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning EDMC, participated in the fraudulent scheme alleged herein. Specifically, facts provided by confidential witnesses establish that the Defendants were aware of, or recklessly disregarded, material adverse facts that contradicted their public statements to the investing public concerning the Company's compliance with federal and state regulations and job placement rates.

168.     Furthermore, the Individual Defendants were on notice of EDMC's past problems with deceptive admission practices as a result of prior litigation and government investigations, including, but not limited to the following:

### *Qui Tam* Matters

169.     On May 3, 2011, a *qui tam* action captioned *Washington v. Education Management Corporation*, United States District Court for the Western District of Pennsylvania, Case No. 07-0461, filed under the False Claims Act in April 2007, was unsealed following the U.S. Department of Justice's decision to intervene in the case.   Among other things, the *Washington* complaint alleges that the Company's compensation plans for admission representatives violated the incentive compensation ban with respect to student recruitment and admissions activity during the period of July 1, 2003 through June 30, 2011.

170.    The *Washington* action further alleges that EDMC made false statements regarding its compensation practices in order to participate in federal student aid programs with "actual knowledge" of their falsity.   On May 6, 2014, in a memorandum and order denying EDMC's motion for summary judgment, the Court summarized Plaintiffs' complaint as follows: "Plaintiffs allege a knowing decision by EDMC executives to perpetuate a company-wide sham Plan to cover up for prohibited compensation practices.   To put it starkly, Plaintiffs allege a coordinated, multi-billion dollar corporate-wide fraud."

171.    On March 13, 2012, a *qui tam* action captioned *Sobek v. Education Management Corporation*, United States District Court for the Western District of Pennsylvania, Case No. 10-0131, filed under the False Claims Act in January 2010, was unsealed after the U.S. Department of Justice declined to intervene in the case.   The *Sobek* action alleges that EDMC violated 34 C.F.R. § 668.14(b)(10) by, *inter alia*, (i) consistently and routinely making false, erroneous, or misleading statements regarding the particular types, specific sources, nature, and extent of its "institutional, programmatic, or specialized accreditation.;" and (ii) consistently and routinely making false, erroneous, or misleading statements regarding "data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truth of the advertisements."   The *Sobek* action also alleges that EDMC failed to adequately track student progress.   The *Sobek* action seeks damages from 2004 to the present.

172.    According to a lawsuit recently filed by the Company's liability insurer, two additional *qui tam* lawsuits have been filed against the Company but remain under seal.

**Government Investigations**

173.    In October 2010, Argosy University received a subpoena from the Florida Attorney General's office seeking a wide range of documents concerning potential

misrepresentations in recruitment, financial aid, and other areas for the period January 2, 2006 to the present.

174.    In December 2010, the Company received a subpoena from the Office of Consumer Protection of the Attorney General of the Commonwealth of Kentucky related to an investigation of the Company's business practices at its six colleges that do business in Kentucky.

175.    In August 2011, the Company received a subpoena from the Attorney General of the State of New York requesting documents related to the Company's compensation of admissions representatives and recruiting activities.

176.    In December 2011, the Company received a letter from the City Attorney of the City of San Francisco, California requesting information related to student recruitment and indebtedness, including recruiting practices and job placement reporting.  In June 2014, the Company entered into an Assurance of Voluntary Compliance, agreeing to pay the aggregate amount of approximately $4.4 million to avoid further litigation.

177.    In January 2013, the New England Institute of Art received a civil investigative demand from the Commonwealth of Massachusetts Attorney General requesting information for the period January 1, 2010 to the present in connection with an investigation of the schools, marketing and advertising of job placement and student outcomes, the recruitment of students, and the financing of education.

178.    On March 20, 2013, the Company received a subpoena from the Division of Enforcement of the Securities and Exchange Commission requesting documents and information related to the Company's valuation of goodwill and its bad debt allowance for student receivables.  Ultimately, no enforcement action was recommended.

179.     On May 24, 2013, the Company received a subpoena from the Office of Inspector General of the U.S. Department of Education requesting policies and procedures related to Argosy University's attendance, withdrawal and return to Title IV polices during the period of July 1, 2010 through December 31, 2011.

180.     In 2014, the Company received inquiries from 14 states related to its business practices.

**Consumer Lawsuits related to Accreditation**

181.     Two separate lawsuits, captioned *Winters, et al. v. Argosy Education Group, et al.* and *McMath, et al. v. Argosy Education Group, et al.*, have been filed by former students alleging, *inter alia*, negligent misrepresentation, breach of contract, violation of the Washington State Consumer Protection Act, negligent infliction of emotional distress, and fraud in connection with the failure to obtain proper accreditation of a clinical psychology program, which left students with a virtually worthless degree upon completion.

182.     The resignations and terminations of key officers and directors of the Company, as well as the suspicious timing of those resignations and termination, also evidence scienter.  In particular, four key executives have left the Company during the Class Period:

- The resignation of Randall J. Killeen, Vice President, Controller and Chief Accounting Officer, was announced on June 27, 2013;

- The termination John M. Mazzoni, the President of The Art Institutes, was announced on June 20, 2013;

- The termination of Todd S. Nelson, Chairman of the Company, was announced on November 1, 2013; and

- The resignation of Robert G. Hrivnak, EDMC's Vice President, Controller

and Chief Accounting Officer, was announced on October 20, 2014.

183.     In addition, Defendants' scienter can also be inferred based on the prior misconduct of certain officers and directors, including former Chairman Todd S. Nelson.  Mr. Nelson previously served as President, then CEO and Chairman of the Apollo Group ("Apollo"), which runs the University of Phoenix.  During Mr. Nelson's tenure at Apollo, the company paid $9.8 million to settle charges brought by the U.S. Department of Education concerning predatory admissions practices at the University of Phoenix, including violations of the incentive compensation ban and other government regulations.  Mr. Nelson was pushed out of Apollo by the company's founder, John Sperling, in January 2006.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

184.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired EDMC securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

185.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, EDMC securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by EDMC or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

186.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

187.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

188.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of EDMC;

- whether the Individual Defendants caused EDMC to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of EDMC securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

189.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

190.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- EDMC securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold EDMC securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

191.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

192.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

193.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

194.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

195.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of EDMC securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire EDMC securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

196.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for EDMC securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about EDMC's finances and business prospects.

197.   By virtue of their positions at EDMC, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

198.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of EDMC securities from their personal portfolios.

199.   Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of EDMC, the Individual Defendants had knowledge of the details of EDMC's internal affairs.

200.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of EDMC.  As officers and/or directors of a publicly-held company, the Individual Defendants had

a duty to disseminate timely, accurate, and truthful information with respect to EDMC's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of EDMC securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning EDMC's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired EDMC securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

201.    During the Class Period, EDMC securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of EDMC securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of EDMC securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of EDMC securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

202.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

203.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

204.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

205.    During the Class Period, the Individual Defendants participated in the operation and management of EDMC, and conducted and participated, directly and indirectly, in the conduct of EDMC's business affairs.  Because of their senior positions, they knew the adverse non-public information about EDMC's misstatement of income and expenses and false financial statements.

206.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to EDMC's financial condition and results of operations, and to correct promptly any public statements issued by EDMC which had become materially false or misleading.

207.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which EDMC disseminated in the marketplace during the Class Period concerning EDMC's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause EDMC to engage in the wrongful acts

complained of herein. The Individual Defendants therefore, were "controlling persons" of EDMC within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of EDMC securities.

208.   Each of the Individual Defendants, therefore, acted as a controlling person of EDMC.  By reason of their senior management positions and/or being directors of EDMC, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, EDMC to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of EDMC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

209.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by EDMC.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 3, 2015

                                     Respectfully submitted,

                                     **POMERANTZ, LLP**

                                     */s/ Jeremy A. Lieberman*
                                     Jeremy A. Lieberman (*pro hac vice*)
                                     Michele S. Carino
                                     C. Dov Berger
                                     600 Third Avenue, 20th Floor
                                     New York, New York 10016
                                     Telephone:  (212) 661-1100
                                     Facsimile:  (212) 661-8665

                                     **POMERANTZ LLP**
                                     Patrick V. Dahlstrom
                                     Ten South LaSalle Street, Suite 3505
                                     Chicago, Illinois  60603
                                     Telephone: (312) 377-1181
                                     Facsimile: (312) 377-1184

                                     **LAW OFFICE OF ALFRED G. YATES, JR., P.C.**
                                     Alfred G. Yates, Jr. Esq. (PA17419)
                                     Gerald L. Rutledge, Esq. (PA62027)
                                     519 Allegheny Building
                                     429 Forbes Avenue
                                     Pittsburgh, PA  15219
                                     Telephone: (412) 391-5164
                                     Facsimile: (412) 471-1033
                                     Email: yateslaw@aol.com

                                   *Attorneys for Plaintiff*